addition, the Student Right-to-Know and Campus Security Act requires universities to publish statistics concerning the occurrence of various campus crimes including: murder; sex offenses (forcible or nonforcible); violent hate crimes; robbery; burglary; motor vehicle theft; aggravated assault; arson; weapons violations; liquor-law violations; and drug related violations. *See* 20 U.S.C. § 1092 (f)(1)(F). *The Chronicle* indeed has access to student disciplinary records and crime related statistics, just not the unfettered access it hoped to secure.

## III. CONCLUSION

Because the district court's grant of summary judgment was consistent with legal precedent and sound statutory interpretation, and because the district court did not abuse its discretion in denying discovery or granting a permanent injunction, we AFFIRM.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0213P (6th Cir.)
File Name: 02a0213p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
　　　*Plaintiff-Appellee,*

　　　　　*v.*

MIAMI UNIVERSITY; OHIO
STATE UNIVERSITY,
　　　*Defendants-Appellees,*

THE CHRONICLE OF HIGHER
EDUCATION,
　　　　　*Intervening
　　　Defendant-Appellant.*

No. 00-3518

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 98-00097—George C. Smith, District Judge.

Argued: August 10, 2001

Decided and Filed: June 27, 2002

Before: SILER and MOORE, Circuit Judges; FORESTER, Chief District Judge.[*]

_____

[*]The Honorable Karl S. Forester, United States Chief District Judge for the Eastern District of Kentucky, sitting by designation.

---

### COUNSEL

**ARGUED:**   Marc D. Mezibov, SIRKIN, PINALES, MEZIBOV & SCHWARTZ, Cincinnati, Ohio, for Appellant. Alisa B. Klein, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, Washington, D.C., Gerald L. Draper, ROETZEL & ANDRESS, Columbus, Ohio, for Appellees.  **ON BRIEF:**   Marc D. Mezibov, Laura A. Abrams, Christian A. Jenkins, SIRKIN, PINALES, MEZIBOV & SCHWARTZ, Cincinnati, Ohio, for Appellant. Alisa B. Klein, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, Washington, D.C., Gerald L. Draper, Margaret R. Carmany, ROETZEL & ANDRESS, Columbus, Ohio, for Appellees. Adam E. Scurti, KING, HARGRAVE, SCURT & JACK, Steubenville, Ohio, Kenneth A. Zirm, WALTER & HAVERFIELD, Cleveland, Ohio, for Amici Curiae.

---

### OPINION

---

KARL S. FORESTER, District Judge.    Intervening Defendant-Appellant *The Chronicle of Higher Education* ("*The Chronicle*") contests the district court's grant of summary judgment and subsequent permanent injunction in favor of Plaintiff-Appellee the United States. Specifically, the district court concluded that university disciplinary records were "educational records" as that term is defined in the Family Education Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, and that releasing such records and the personally identifiable information contained therein constitutes a violation of the FERPA. The district court permanently enjoined the Defendants-Appellees Miami University and The Ohio State University ("Miami," "Ohio State," or collectively "Universities") from releasing student disciplinary records or any "personally identifiable information" contained therein, except as otherwise expressly

is an "academic institution, not a courtroom or administrative hearing room." *Board of Curators v. Horowitz*, 435 U.S. 78, 88 (1977).   As we noted earlier, student disciplinary proceedings exclusively affect the relationship between a particular student and the university. Not only do the rules, regulations and proceedings define the terms of that relationship, they also serve as an effective part of the teaching process. *See Goss*, 419 U.S. at 583. Public access will not enhance this relational determination, nor will it aid in the student's education. In fact, due to inevitably heightened public scrutiny, public access to disciplinary proceedings may force universities to afford students more procedural due process protections than are required by the Constitution. As the Supreme Court noted, enhanced procedural requirements "may not only make [student disciplinary proceedings] too costly as a regular disciplinary tool but [it may] also destroy [the proceedings'] effectiveness as part of the teaching process." *Id.* We find that public access will not aid in the functioning of traditionally closed student disciplinary proceedings; accordingly, *The Chronicle* does not enjoy a qualified First Amendment right of access to such proceedings.[24]

Finally, a denial of access to student disciplinary records does not prevent *The Chronicle* from obtaining information about crime on university campuses. Pursuant to the district court's injunction, *The Chronicle* may still request student disciplinary records that do not contain personally identifiable information. Nothing in the FERPA would prevent the Universities from releasing properly redacted records. In

---

[24] Even if a qualified First Amendment right of access attached to these proceedings, which it clearly does not, the common law recognizes various exceptions to the right of access including certain privacy rights of participants or third parties. *Brown & Williamson Tobacco Corp.*, 710 F.2d at 1179 (citing *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978)). These privacy rights are of particular import when recognized and protected by federal statutory provisions like the FERPA. *See In re The Knoxville News-Sentinel Co., Inc.*, 723 F.2d 470, 476 (6th Cir. 1983) (holding that it was appropriate to seal banking records when Congress clearly mandated the privacy of those records).

(denying right of access to judicial disciplinary proceedings and records unless the records subsequently are filed in a court of law); *Jessup v. Luther*, 277 F.3d 926, 928-29 (7th Cir. 2002) (noting that settlement agreements and arbitrations are private documents subject to a right of access only when filed in the court record); *United States v. El-Sayegh*, 131 F.3d 158, 162-63 (D.C. Cir. 1997) (holding that there is no First Amendment or common law right of access to documents which played no role in a judicial decision). Therefore, we decline to evaluate student disciplinary proceedings with the same deferential eye toward First Amendment access as we would government criminal proceedings.

With that in mind, we turn to the two-part test applied by courts when determining whether a qualified First Amendment right of access attaches in a particular situation. First, we must consider whether student disciplinary proceedings and records "historically [have] been open to the press and general public." *Press Enterprise II*, 478 U.S. at 8. The question is as easily answered as it is raised. Student disciplinary proceedings have never been open to the public and until the Ohio Supreme Court decision in *Miami*, they were presumed to be protected by the FERPA. This conclusion is supported by the fact that *The Chronicle* filed its record request with the Universities a mere five days after the Ohio Supreme Court concluded that student disciplinary records were not "education records" within the meaning of the FERPA. Moreover, if student disciplinary proceedings were historically open to the public, then a request "for records of all disciplinary proceedings handled by the university's internal judicial system for calendar years 1995 and 1996" would not have sparked so much controversy. Clearly student disciplinary proceedings do not satisfy the first prong of the test. *See First Amendment Coalition*, 784 F.2d at 471-77.

In addition, "public access [does not] play[] a significant positive role in the functioning of the particular process in question[.]" *Press Enterprise II*, 478 U.S. at 8. A university

---

permitted under the FERPA. For the reasons that follow, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case was born of a dispute between a university newspaper and the university's administration. In the spring of 1995, the editor-in-chief of Miami's student newspaper, *The Miami Student* ("the paper"), sought student disciplinary records from the University Disciplinary Board ("UDB") to track crime trends on campus.[1]  *State ex rel. Miami Student v. Miami University,* 680 N.E.2d 956, 957 (Ohio 1997). Miami initially refused to release the requested records, but after the editors made a written request pursuant to the Ohio Public Records Act, Ohio Rev. Code § 149.43, for all UDB records from 1993-1996, Miami released the records. *Id.* Pursuant to the FERPA privacy provisions, however, Miami redacted "from these records the identity, sex, and age of the accuseds [sic], as well as the date, time and location of the incidents giving rise to the disciplinary charges." *Id.* The editors were dissatisfied with Miami's redacted disclosure and subsequently filed an original mandamus action in the Ohio Supreme Court seeking full disclosure of the UDB records, redacting only the "name, social security number, or student I.D. number of any accused or convicted party." *Id.*

A divided Ohio Supreme Court granted the editors a writ of mandamus. *Id.* at 958. According to the Court, the Ohio Public Records Act "provides for full access to all public records upon request unless the requested records fall within one of the specific exceptions listed in the Act." *Id.* The relevant exception in the *Miami* case "excludes from the definition of public records those records 'the release of which is prohibited by state or federal law.'" *Id.* (quoting

---

[1] Later that year, the editor-in-chief's successor joined in her pursuit to obtain the student disciplinary records, hereinafter collectively referred to as the "editors."

Ohio Rev. Code § 149.43(A)(1)(o)).[2] Relying on a Georgia Supreme Court case,[3] the Ohio Supreme Court concluded that university disciplinary records were not "education records" as defined in the FERPA. *Id.* at 958-59. The Ohio Court reasoned that, because disciplinary records were not protected by the FERPA, they did not fall within the prohibited-by-federal-law exception to the Ohio Public Records Act. *Id.* Accordingly, the Court granted a writ of mandamus compelling Miami to provide the records requested by the editors. *Id.* at 959-60. Miami sought United States Supreme Court review of the Ohio decision, but the Supreme Court denied certiorari. *Miami University v. The Miami Student*, 522 U.S. 1022 (1997).

On the heels of the Ohio Supreme Court decision, *The Chronicle*,[4] pursuant to the Ohio Public Records Act, made written requests of Miami and Ohio State for disciplinary records amassed during the calendar years 1995 and 1996. Because the Ohio Supreme Court concluded that student disciplinary records were not educational records covered by the FERPA, *The Chronicle* requested the records with names intact and minimal redaction as required by the Ohio Public Records Act. Upon receipt of the request, and in light of the Ohio Supreme Court decision, Miami contacted the United States Department of Education ("DOE") and explained that

---

[2] The Ohio Legislature subsequently amended the Ohio Public Records Act and the pertinent provision is now found at Ohio Rev. Code § 149.43(A)(1)(v). The Court will use the updated citation for the remainder of the opinion.

[3] *Red & Black Publishing Co. v. Bd. of Regents of Univ. Sys. of Georgia*, 427 S.E.2d 257 (Georgia 1993).

[4] *The Chronicle* states that it is "engaged in the business of publishing and distributing a national weekly newspaper, . . . that is the preeminent source of information about higher education in the United States." *The Chronicle*'s *Motion to Intervene* in the underlying district court case, J.A. at 102.

---

This is true because student disciplinary proceedings govern the relationship between a student and his or her university, not the relationship between a citizen and "The People." Only the latter presumptively implicates a qualified First Amendment right of access to the proceedings and the records. *See Richmond Newspapers*, 448 U.S. at 580; *Press Enterprise II*, 478 U.S. at 8.

In *Cincinnati Gas and Elec. Co. v. General Elec. Co.*, the district court ordered the parties to participate in a summary jury trial which was to be closed to the press and the public. 854 F.2d 900, 901-02 (6th Cir. 1988), *cert. denied*, 489 U.S. 1033 (1989). Various newspapers moved to intervene for the limited purpose of challenging closure of the summary jury trial proceeding. *Id.* at 902. The district court denied the newspapers' motion and the newspapers appealed. On appeal, the newspapers argued, *inter alia*, that "the summary jury proceeding is analogous in form and function to a civil or criminal trial on the merits, and therefore, the First Amendment right of access which encompasses civil and criminal trial . . . proceedings also encompasses the summary jury proceedings." *Id.* at 902. Rejecting the analogy, this Court pointed to the "manifold differences" between summary jury proceedings and a "real trial." *Id*. at 904. In addition to several procedural differences similar to those in the case *sub judice*, the Court found it "important to note that the summary jury trial does not present any matter for adjudication *by the court*," despite the fact that the district court judge ordered the proceeding which takes place in a federal courthouse and is overseen by a federal judge. *Id.*; *see also In re Cincinnati Enquirer*, 94 F.3d 198 (6th Cir. 1996), *cert. denied*, 520 U.S. 1104 (1997).

Similarly, while student disciplinary proceedings may resemble a criminal trial in some limited respects and while certain university rule and regulation violations may also constitute criminal behavior, student disciplinary proceedings do not present matters for adjudication by a court of law. *See First Amendment Coalition v. Judicial Inquiry and Review Board*, 784 F.2d 467, 471-77 (3d Cir. 1986) (*en banc*)

interfere with the traditional criminal prosecutions that would otherwise remedy this criminal behavior. If these cases were instead handled through traditional criminal prosecutions, *The Chronicle* argues, then the First Amendment would undeniably require access to the underlying criminal trials, proceedings and records. That these ostensibly criminal activities are dressed up as student rule infractions does not change the fact that student disciplinary boards are adjudicating criminal matters, and those criminal matters have historically enjoyed open access to the press and general public.

In drawing these conclusions, *The Chronicle* omits a few important facts. University disciplinary proceedings are not criminal proceedings despite the fact that some behavior that violates a university's rules and regulations may also constitute a crime. For many reasons, student disciplinary proceedings do not "afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." *Goss v. Lopez*, 419 U.S. 565, 583 (1975). Not only are students often denied the procedural due process protections cherished by our judicial system, they are also denied procedural finality. The protections against "double jeopardy" do not attach to university disciplinary proceedings; therefore, as the Ohio State and Miami student handbooks explain, a student may be disciplined or sanctioned by the Universities and still be subject to local, state or federal criminal prosecution for the same offense.[23]

---

[23]*Code of Student Conduct*, Miami University, 3, J.A. 524; *Code of Student Conduct*, The Ohio State University, 85, J.A. 546. "Students are also advised that a disciplinary action by the University does not preclude the possibility that a separate criminal or civil prosecution may also follow, and that, conversely, questionable conduct in the non-University community may be grounds for the University's taking action as well." *Miami University Disciplinary Procedures*, originally submitted by *The Chronicle's* counsel in the *Miami* Ohio Supreme Court mandamus action, Tab 2, Exhibit 13, J.A. 175. The Miami University Disciplinary Board Summary occasionally reflects this mutuality. *See, e.g.*, Tab 2, Exhibit 14, J.A. 177, 178, 179, 184.

---

it might not be able to comply with the FERPA.[5]  The DOE told Miami that it believed the Ohio Supreme Court was incorrect in holding that student disciplinary records are not "education records" under the FERPA. *Declaration of LeRoy S. Rooker*, J.A. at 91. The DOE assured Miami "that the FERPA prohibits the University from releasing personally identifiable information contained in student disciplinary records." *Id.*

In December of 1997, Miami complied in part with *The Chronicle*'s request by providing the newspaper virtually unredacted disciplinary records from November, 1995, and November, 1996. *Id.* at 92. Miami informed the DOE that it intended to comply with the remainder of *The Chronicle*'s request. *Id.* In addition, Miami advised the DOE that it "had adopted a policy of releasing disciplinary records to any third-party requestor." *Id.*

In January of 1998, Ohio State confirmed with the DOE that it too had received *The Chronicle*'s request for all disciplinary records from 1995 and 1996. *Id.* Ohio State informed the DOE that it already had released unredacted disciplinary records from November, 1995, and November, 1996. *Id.* Thereafter, Ohio State told the DOE that it intended to comply with the remainder of *The Chronicle*'s request. *Id.*

Shortly after the DOE learned that Miami and Ohio State intended to release student disciplinary records containing personally identifiable information without the consent of the student, the United States filed the underlying complaint

---

[5]When an educational agency or institution believes that it cannot comply with the FERPA due to a potential conflict with state laws, it must notify the DOE, citing the potentially conflicting law. *See* 34 C.F.R. § 99.61.

against the Universities.[6]  In the complaint, the DOE sought declaratory and preliminary and permanent injunctive relief prohibiting the Universities from releasing student disciplinary records that contain personally identifiable information, except as permitted under the FERPA.  The DOE immediately filed a motion to preliminarily enjoin the Universities' release of student disciplinary records.  The district court granted the motion and noted that the parties did not dispute the material facts; therefore, the court was left with a pure question of law.

On February 13, 1998, *The Chronicle* filed an unopposed motion to intervene and the district court granted the motion. *The Chronicle* subsequently filed a motion to dismiss the action and a motion to establish an order of procedure.  The motion to dismiss contended that the DOE lacked standing to bring this action and that the DOE's enforcement power was limited to the administrative remedies outlined in the FERPA. The second motion alleged that *The Chronicle* may dispute certain material facts.  *The Chronicle* requested a reasonable period of time for discovery and the filing of additional affidavits to develop those facts.

The DOE responded to *The Chronicle*'s motions and filed its own motion for summary judgment.  The district court denied *The Chronicle*'s motion to dismiss and motion for an order of procedure.  Determining that the student disciplinary records were "education records" under the FERPA, the court granted the DOE's motion for summary judgment and permanently enjoined the Universities from releasing student

---

[6]The United States brought the underlying action on its own behalf and on behalf of the United States Department of Education, hereinafter referred to collectively as the "DOE."

*Virginia*, 448 U.S. 555, 580 (1980) ("the right to attend criminal trials is implicit in the guarantees of the First Amendment").[22]    As the Supreme Court explained, a qualified right of access attaches where (1) the information sought has "historically been open to the press and general public"; and (2) "public access plays a significant positive role in the functioning of the particular process in question[.]" *Press-Enter. Co. v. Superior Court (Press Enterprise II)*, 478 U.S. 1, 8 (1986) (applying this test and recognizing a qualified right of access to a preliminary hearing transcript in a criminal matter).  Once the qualified First Amendment right of access attaches, it can "be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise Co. v. Superior Court (Press Enterprise I)*, 464 U.S. 501, 510 (1984).  "The right of access is not absolute, however, despite these justifications for the open courtroom."  *Brown & Williamson Tobacco Corp.*, 710 F.2d at 1179.

From the outset, *The Chronicle* colors certain student disciplinary proceedings as criminal proceedings.  First, *The Chronicle* notes that university disciplinary boards adjudicate various infractions of student rules and regulations which may include: underage drinking; physical and sexual assault; and theft and destruction of property.  It then contends that, by hearing these cases, the university disciplinary boards

---

[22]In the heat of these landmark Supreme Court decisions, this Court concluded that "[t]he Supreme Court's analysis of the justifications for access to the criminal courtroom apply as well to the civil trial." *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1178 (6th Cir. 1983) (vacating the lower court's order to seal certain F.T.C. documents filed in the court's record during a preenforcement challenge to proposed changes in cigarette testing) (citing *Richmond Newspapers,* 448 U.S. at 580 n.17 (noting that historically civil trials have been presumptively open, but declining to decide whether they enjoy a First Amendment right of access because the issue was not before the Court)), *cert. denied*, 465 U.S. 1100 (1984). *See, e.g., Smith v. United States Dist. Court*, 956 F.2d 647, 650 (7th Cir.1992) (recognizing a right of access to civil proceedings).

to protect the privacy interests embodied in the FERPA, and is narrowly tailored to enjoin only the release of student disciplinary records or any personally identifiable information contained therein, except as otherwise expressly permitted under the FERPA, we conclude that the district court did not abuse its discretion in granting such relief.[21]

### H.   The First Amendment

*The Chronicle* contends that there is a First Amendment right of access to student disciplinary records detailing criminal activities and punishment.  To the extent that the permanent injunction limits access to those documents, *The Chronicle* argues that it constitutes a violation of *The Chronicle's* First Amendment rights.

"It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 684-85 (1972).  Moreover, "[t]he Constitution itself is [not] a Freedom of Information Act," permitting the release of government records at the will of the public.  *Houchins v. KQED, Inc.*, 438 U.S. 1, 14 (1978).  "Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." *Id.* at 15.

That being said, the Supreme Court repeatedly has recognized a First Amendment right of access to criminal trials, proceedings, and records.  *Richmond Newspapers v.*

---

[21]We note that if Congress changes the definition of "education records" or otherwise alters the balance struck in the FERPA such that a different interpretation of student disciplinary records must be reached, or the DOE changes its interpretation of law enforcement unit records, *The Chronicle* or the Universities may move the district court to lift the injunction.  Moreover, if the Universities choose to discontinue their receipt of federal education funds, then they may also move the court to lift the injunction and release student disciplinary records to the extent authorized by law.

disciplinary records in violation of the FERPA.[7]  This timely appeal followed.

### II.   *THE CHRONICLE'S* APPEAL

*The Chronicle* asserts that the district court should be reversed for several reasons.  First, *The Chronicle* contends that the DOE lacks standing to bring an action seeking injunctive relief and compliance with the FERPA.  Second, *The Chronicle* argues that the district court erred in holding that the FERPA "prohibits" education records disclosure, thereby concluding that education records were not subject to disclosure under the Ohio Public Records Act.  Instead, *The Chronicle* contends that the district court implicitly held that the Ohio public records law was preempted by the FERPA.  Third, *The Chronicle* alleges that the district court erred in holding that student disciplinary records are education records within the meaning of the FERPA.  Next, *The Chronicle* contends that the district court erred by granting summary judgment without first permitting discovery to develop a sufficient factual record.  Fifth, *The Chronicle* alleges that the United States had an entirely adequate remedy at law and failed to show irreparable harm; therefore, the district court erred in granting broad permanent injunctive relief.  Finally, *The Chronicle* argues that, to the extent it prohibits disclosure of student disciplinary records, the FERPA violates the First Amendment and the district court failed to recognize that violation.  After a recitation of the applicable standards of review and a brief FERPA synopsis, we will address these arguments in turn.

---

[7]Given this author's intimate familiarity with the caseload and backlog facing district court judges across the country, Judge George Smith should be commended for his remarkably detailed and insightful opinion and order in this case. *See United States v. Miami University*, 91 F.Supp.2d 1132 (S.D.Ohio 2000).

## A.    Standards of Review

We review a district court's grant of summary judgment *de novo*, using the same standard employed by the district court. *Herman Miller, Inc. v. Palazzetti Imports and Exports*, 270 F.3d 298, 308 (6th Cir. 2001) (citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997)). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, this Court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party. *Herman Miller, Inc.,* 270 F.3d at 308 (citing *National Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997)). Nonetheless, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient;" as noted above, the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252 (1986) (emphasis in original).

This Court reviews *de novo* the district court's determination of whether the plaintiff had standing to bring the present case while affording due deference to the court's factual determinations on the issue. *See Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 492 (6th Cir. 1999). In addition, we review issues of statutory interpretation *de novo*. *Walton v. Hammons,* 192 F.3d 590, 592 (6th Cir. 1999).

The decision to grant a permanent injunction is within the sound discretion of the district court. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998) (citing *Wayne v. Village of Sebring*, 36 F.3d 517, 531 (6th Cir. 1994)). Accordingly, we review a district court's grant of permanent injunction for abuse of that discretion. *See CSX Transp., Inc. v. Tennessee State Bd. of Equalization*, 964 F.2d 548, 553 (6th Cir. 1992). "A district court abuses its discretion when it relies on clearly erroneous findings of fact or when it

nearly impossible to obtain voluntary compliance under 20 U.S.C. § 1234c(a)(3). Cutting off federal funding under 20 U.S.C. § 1234c(a)(1) would be detrimental to the Universities' educational purpose and would injure more students than it would protect. Furthermore, it would not guarantee compliance with the purpose of the FERPA because the defendants would still feel constrained to follow the Ohio Supreme Court's interpretation of the Act.

Next, a cease and desist order under 20 U.S.C. § 1234c(a)(2) is inadequate for two reasons. First, it requires new enforcement measures each time a violation occurs. Second, as the district court noted, a cease and desist order is not self-executing -- it can only be enforced by withholding funds or by referring the matter to the Attorney General for enforcement. We have already noted that withholding funds is inadequate and piecemeal enforcement leads to intermittent violative releases that would otherwise be protected by permanent injunctive relief. Having balanced the alternatives, the district court's permanent injunction was not an abuse of discretion.

Finally, *The Chronicle* contends that the district court's injunction was too broad. Courts regularly have afforded much more invasive relief, with less consideration, as a result of state violations of spending conditions. *See, e.g., King*, 392 U.S. at 332-33 (striking a state regulation as invalid because it defined a term in a manner that was inconsistent with the spending clause condition); *Townsend v. Swank*, 404 U.S. 282, 285-86 (1971) (striking a state statute without even addressing the form of relief); *Rosado v. Wyman*, 397 U.S. 397, 420-22 (1970) (enjoining the release of federal welfare funds). Over the years, courts have expressed a reluctance to require states to expend a great deal of their own revenue to comply with federal spending conditions, *see Rosado*, 397 U.S. at 421, and have declined to enforce open-ended and potentially burdensome obligations, *see Pennhurst State School and Hospital*, 451 U.S. at 29. Instead, courts generally seem to prefer prospective relief like the permanent injunction issued in this case. *See id.* Because this injunction is crafted

federal funding. *Wheeler v. Barrera*, 417 U.S. at 416-19; *see also Crawford v. Pittman*, 708 F.2d 1028, 1036 (5th Cir. 1983). The district court does not take an overly active role in the Universities' function and the injunction does not involve supervision of a state's expenditures. "Our decision requires only that [the Universities] fulfill the contract[s] [they] made when [they] chose to receive federal moneys under the Act." *Crawford*, 708 F.2d at 1036. We reject *The Chronicle's* argument under § 1232a.

Based upon the foregoing analysis, we hold that continued release of student disciplinary records will irreparably harm the United States and the DOE. Before a permanent injunction issues, however, we must determine whether there is any other adequate remedy at law. *Kallstrom*, 136 F.3d at 1067. *The Chronicle* contends that money damages or administrative remedies will satisfy the injuries suffered by the DOE. Even if equitable relief is appropriate, *The Chronicle* believes that the district court's blanket injunction is too broad.

"[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp.*, 973 F.2d at 511. In general, a loss of privacy and injury to reputation are difficult to calculate. These difficulties are compounded by the fact that the DOE or *The Chronicle* have no way of knowing how many people would require compensation and how much money would compensate each injury. Moreover, we have already concluded that the harm suffered by the myriad number of students affected by the continued release of student disciplinary records is irreparable, and by definition, not compensable. Accordingly, money damages are insufficient relief.

Second, none of the administrative remedies authorized by the FERPA would stop the violations. The Ohio Supreme Court's decision in *Miami* serves as precedent to compel Miami and Ohio State to release student disciplinary records in the absence of a federal court injunction. Thus, it would be

improperly applies the law." *Herman Miller, Inc.,* 270 F.3d at 317 (citing *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir. 1985)). "An abuse of discretion is defined as a definite and firm conviction that the district court committed a clear error of judgment." *Id.* (citing *Pouillon v. City of Owosso*, 206 F.3d 711, 714 (6th Cir. 2000)).

## B.    Family Education Rights and Privacy Act

For the last quarter of a century, the FERPA has helped protect the privacy interests of students and their parents. In fact, Congress enacted the FERPA "to protect [parents' and students'] rights to privacy by limiting the transferability of their records without their consent." Joint Statement, 120 Cong. Rec. 39858, 39862 (1974). Pursuant to its constitutional spending power,[8] Congress provides funds to educational institutions via the FERPA on the condition that, *inter alia*, such agencies or institutions do not have a "policy or practice of permitting the release of education records (or personally identifiable information contained therein . . . ) of students without the written consent of [the students or] their parents[.]" 20 U.S.C. § 1232g(b)(1). The Act also provides that "[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records," except as permitted by the Act. 20 U.S.C. § 1232g(b)(2).[9]

---

[8] "The Congress shall have the Power to . . . provide for the . . . general Welfare of the United States[.]" U.S. Const. art. I, § 8, cl. 1. The Constitutional spending power permits Congress to fix the terms on which it disburses federal money to the states, and to receive those funds, the states must agree to comply with clearly stated, federally imposed conditions. *See Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981).

[9] The DOE's definition of "personally identifiable information" includes the student's name, a family member's name, the address of the student or family member, personal identifiers such as the student's social security number or student number, and personal characteristics or other

Congress also recognizes that, based upon the privacy interests protected by the FERPA, educational institutions may withhold from *the federal government* certain personal data on students and families.  *See* 20 U.S.C. § 1232i. Because Congress holds student privacy interests in such high regard:

> the refusal of a[n] . . . educational agency or institution . . . to provide personally identifiable data on students or their families, as a part of any applicable program, to any Federal office, agency, department, or other third party, on the grounds that it constitutes a violation of the right to privacy and confidentiality of students or their parents, shall not constitute sufficient grounds for the suspension or termination of Federal assistance.

*Id.*  In other words, Congress places the privacy interests of students and parents above the federal government's interest in obtaining necessary data and records.  The Act broadly defines "education records" as "those records, files, documents, and other materials which (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution."  20 U.S.C. § 1232g(a)(4)(A).

information that would make the student's identity easily traceable.  *See* 34 C.F.R. § 99.3

this conclusion in conjunction with the fact that Congress granted the DOE authority to sue, presumably for injunctive relief, to enforce the Universities' obligations under the FERPA, we find that the DOE will suffer irreparable harm if the Universities are not enjoined from releasing the subject student disciplinary records.

Moreover, millions of people in our society have been or will become students at an educational agency or institution, and those people are the object of FERPA's privacy guarantees. Accordingly, systematic violations of the FERPA provision result in appreciable consequences to the public and no doubt are a matter of public interest.  *See Virginia Railway v. System Federation No. 40*, 300 U.S. 515, 552 (1937).  In cases involving the public interest as defined or protected by an Act of Congress, courts have long held that equitable discretion "must be exercised in light of the large objectives of the Act.  For the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief in these cases." *Hecht*, 321 U.S. at 331.  "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Virginia Railway,* 300 U.S. at 552 (citations omitted).  Based on this broad grant of equitable discretion, we conclude that the United States must represent the public interests at stake.  In light of the noble and broad objectives of the FERPA and the irreparable harm to the public interest, injunctive relief was appropriate in this case.

*The Chronicle* also argues that 20 U.S.C. § 1232a prevents the district court's injunction.  In sum, the statute states that no provision "shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over ... any educational school system."  *Id.*  "[T]his concern was directed primarily at the possibility of [DOE's] assuming the role of a national school board," but it may also apply if a federal court plays "an overly active role in supervising" a state's expenditures of

involved, including the perpetrator, the victim and any witnesses. In addition, the inherent privacy interest that Congress sought to protect will be greatly diminished. Once personally identifiable information has been made public, the harm cannot be undone.

"When a specific interest and right has been conferred upon the United States by statute, the remedies and procedures for enforcing that right are not to be narrowly construed so as to prevent the effectuation of the policy declared by Congress." *United States v. York*, 398 F.2d 582, 586 (6th Cir. 1968). The United States (and the DOE) brought this action to enforce the Universities' guarantees and to protect the privacy interests of the students at those Universities.[20] To be sure, ours is a "government of the people, by the people, for the people." A. Lincoln, *Gettysburg Address* (1863) (quoted in *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 821 (1995)). It logically follows that if Congress values the privacy interests acknowledged in the Congressional record, and authorizes the DOE to enforce those privacy interests, it must also contemplate that the DOE experiences the irreparable harm suffered by those students whose privacy interests are violated. *See generally United States v. City and County of San Francisco*, 310 U.S. 16, 29-31 (1940) (interpreting a statute that allowed the United States to enjoin San Francisco, presumably for the benefit of the City's citizens, without requiring the United States to show irreparable harm); *see also Board of Comm'rs of Jackson County v. United States*, 308 U.S. 343, 349 (1939) (recognizing the United States's authority to enforce a treaty and in so doing, sue on behalf of a Native American who had been improperly taxed by Jackson County, Kansas). Viewing

---

[20]Congress did not establish individually enforceable rights through the FERPA. *Gonzaga University*, 536 U.S. ___, slip op. at 12-13, 2002 WL 1338070, at *9. Instead, Congress acknowledged students' and parents' privacy interests as a whole and empowered the DOE to protect those interests when a University systemically ignores its obligations under the FERPA. *See id. See also* 20 U.S.C. § 1232g (b)(1)-(2), § 1234c (a).

---

## C.   Standing

On appeal, *The Chronicle* contends that the DOE and the United States[10] do not have standing to bring this suit for injunctive relief because Congress has not conferred such authority upon them, and because they are bound by the administrative remedies enumerated in the Act and its corresponding regulations. Indeed, "[a]gencies do not automatically have standing to sue for actions that frustrate the purposes of their statutes." *Dir. Office of Workers' Compensation Programs, DOL v. Newport News Shipbuilding and Dry Dock Co.*, 514 U.S. 122, 132 (1995). An agency garners its authority to act from a congressional grant of such authority in the agency's enabling statute. *See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). If Congress does not expressly grant or necessarily imply a particular power for an agency, then that power does not exist. *See Walker v. Luther*, 830 F.2d 1208, 1211 (2d Cir. 1987). Accordingly, we must look to the language of the Act and its enforcement provisions to determine whether Congress intended to provide the DOE with standing to sue for injunctive relief.

The express language of the FERPA provides:

The Secretary shall take appropriate actions to enforce this section and to deal with violations of this section, in accordance with this chapter, except that action to terminate assistance may be taken only if the Secretary finds there has been a failure to comply with this section, and he has determined that compliance cannot be secured by voluntary means.

---

[10]As noted earlier, the United States sued on its own behalf and on behalf of the DOE. When faced with this situation, other courts have held that the United States may sue in its own name even though a statute bestows enforcement rights and obligations on a federal agency. *See, e.g., United States v. Stuart*, 392 F.2d 60, 64 (3d Cir.1968) ("[T]he SBA is a nonincorporated federal agency and an integral part of the United States Government; []while the Administrator may sue, the United States may also sue on this type of claim as the real party in interest.")

20 U.S.C. § 1232g(f). Standing alone, this singular provision, allowing the Secretary to take "appropriate actions" to enforce this section, arguably may not sufficiently empower the DOE to enforce the FERPA through the courts.  *Cf. Dir. Office of Workers' Compensation Programs, DOL,* 514 U.S. at 132. Congress did not resign the Secretary's enforcement power to this sole, imprecise provision.  Instead, 20 U.S.C. § 1234c(a) provides that the Secretary may take the following actions when a recipient of funds fails to comply with the FERPA:

> (1) withhold further payments under that program, as authorized by section 1234d of this title;

> (2) issue a complaint to compel compliance through a cease and desist order of the Office, as authorized by section 1234e of this title;

> (3) enter into a compliance agreement with a recipient to bring it into compliance, as authorized by section 1234f of this title; or

> (4) *take any other action authorized by law with respect to the recipient*.

*Id.* (emphasis added).  We believe that the fourth alternative expressly permits the Secretary to bring suit to enforce the FERPA conditions in lieu of its administrative remedies.  The Fifth Circuit held as much when reviewing a similar catch-all enforcement provision in the Rehabilitation Act, 29 U.S.C. § 794.  *See United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1050 (5th Cir. 1984) ("We do not mean to imply that a federal agency seeking to enforce . . . Section 504 must resort to administrative remedies.  The statute expressly states otherwise: an agency may resort to 'any other means authorized by law' - including the federal courts.").  The District of Columbia Circuit recognized similar alternatives under Title VI of the Civil Rights Act.  *See National Black Police Ass'n v. Velde*, 712 F.2d 569, 575 (D.C.Cir.1983), *cert. denied*, 466 U.S. 963 (1984) (Title VI "allows the funding agency to effect compliance through funding termination or 'any other means authorized by law.'    Although fund

(providing a thorough discussion of instances when courts should and should not balance equitable considerations) *with United States v. Szoka*, 260 F.3d 516, 523-24 (6th Cir. 2001)(discussing a statute in which Congress foreclosed the exercise of equitable discretion).    Accordingly, the "reasonable cause" standard enunciated in *CSX* does not apply to the instant case and we must embrace our traditional role in equity.[17]

Our first step is to determine whether "failure to issue the injunction is likely to result in irreparable harm." *Kallstrom*, 136 F.3d at 1068.  With that in mind, we consider the express purposes of the FERPA as well as the parties and interests involved in this litigation.

One explicit purpose of the FERPA is "to protect [students'] rights to privacy by limiting the transferability of their records without their consent."  Joint Statement, 120 Cong. Rec. 39858, 39862 (1974).[18]  Congress effectuated this purpose by providing that: "No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records." 20 U.S.C. § 1232g(b)(2).[19]  Therefore, the Universities' continued release of student disciplinary records clearly will injure the reputations of the students

---

[17] Because the statute in this case clearly is distinguishable from the statute in *CSX*, we express no opinion as to the validity of the "reasonable cause standard" in general.

[18] Ten years before Congress enacted the FERPA, the Supreme Court surmised that "the First Amendment has a penumbra where privacy is protected from governmental intrusion." *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965).  Accordingly, certain student privacy interests are recognized in the FERPA and may find protection in the Constitution.

[19] As we noted above, this provision creates a binding obligation on schools that accept federal funds not to release education records without consent.    The FERPA provisions permit the DOE to enforce this obligation.

*Burlington Northern R.R. v. Bair*, 957 F.2d 599, 601 (8th Cir. 1992). *CSX* held that when:

> Congress has expressly authorized the granting of injunctive relief to halt or prevent a violation of [a statute], traditional equitable criteria do not govern the issuance of preliminary injunctions under [that statute]. In order to issue a preliminary injunction under [the statute], a court must determine only whether there is "reasonable cause" to believe that a violation of [the statute] has occurred or is about to occur.

964 F.2d at 551 (citations omitted). However, the statute in *CSX* "expressly conferred jurisdiction on United States district courts 'to grant such mandatory and prohibitive injunctive relief . . . as may be necessary to prevent, restrain, or terminate' any violations of the section." *Id.* at 550.[16] The Eighth and Ninth Circuits interpreted identical or similar language.

When a recipient of funds fails to comply with the FERPA, Congress permits the Secretary of Education to "take any . . . action authorized by law with respect to the recipient."  20 U.S.C. § 1234c(a)(4).  While this provision certainly permits the DOE to bring a cause of action, including, *inter alia*, an action for injunctive relief, it does not expressly authorize the granting of injunctive relief to halt or prevent a violation of the FERPA. *Cf. CSX Transportation, Inc.*, 964 F.2d at 551. Given the assortment of remedies available in the FERPA, Congress by no means foreclosed the exercise of equitable discretion. *Compare Weinberger,* 456 U.S. at 311-320

---

[16]The original section of the statute involved in *CSX* expressly provided for injunctive relief. *See* § 306(2) of the Railroad Revitalization and Regulatory Reform Act of 1976, originally codified at 49 U.S.C. § 26c (1976). When the Act was recodified at 49 U.S.C. § 11503(c), the express authority to enjoin was omitted from the statute, but Congress stated that language changes that occurred during recodification were not intended to be substantive. Therefore, the court held that § 11503(c) still expressly granted "the authority to district courts to issue injunctive relief to prevent or terminate violations." *CSX*, 964 F.2d at 550.

termination was envisioned as the primary means of enforcement under Title VI, . . . Title VI clearly tolerates other enforcement schemes.  Prominent among these other means of enforcement is referral of cases to the Attorney General, who may bring an action against the recipient. The choice of enforcement methods was intended to allow funding agencies flexibility in responding to instances of discrimination.")(footnotes omitted).

Having reached that conclusion, it follows that the DOE can proceed in equity: a common and "authorized" means to enforce legal obligations. After all, this Court will not lightly assume that Congress has stripped it of its equitable jurisdiction; such departure from equity requires a clear and valid legislative command. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).

Even in the absence of statutory authority, the United States has the inherent power to sue to enforce conditions imposed on the recipients of federal grants. "[L]egislation enacted pursuant to the spending power [, like the FERPA,] is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State School and Hospital,* 451 U.S. at 17; *King v. Smith*, 392 U.S. 309, 333 n. 34 (1968)("There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed.").  If Congress imposes a "condition on the grant of federal moneys, it must do so unambiguously;" otherwise, the State cannot "voluntarily and knowingly accept[] the terms of the 'contract.'" *Id.*

Spending clause legislation, when knowingly accepted by a fund recipient, imposes enforceable, affirmative obligations upon the states. *See Wheeler v. Barrera*, 417 U.S. 402, 427 (1974), *modified on another ground,* 422 U.S. 1004 (1975) (recognizing that states and local agencies must fulfill their part of a spending clause contract if they choose to accept the

funds); *King*, 392 U.S. at 333; *see also South Dakota v. Dole*, 483 U.S. 203, 206-08 (1987) (noting that clearly stated conditions permit a State to be "cognizant of the consequences of their participation"). Finally, the Supreme Court repeatedly has recognized a court's equitable powers to enforce spending clause obligations and conditions under various statutes. *See Rosado v. Wyman*, 397 U.S. 397, 420-22 (1970) (enjoining the implementation of a state welfare program because the state scheme conflicted with the spending clause conditions in federal legislation); *Pennhurst State School and Hospital,* 451 U.S. at 29 (listing various equitable remedies for state violations of spending legislation conditions).

"Under FERPA, schools and educational agencies receiving federal financial assistance *must* comply with certain conditions. One condition specified in the Act is that sensitive information about students *may not be released* without [the student's] consent." *Owasso Independent School District v. Falvo,* 534 U.S. 426, 122 S.Ct. 934, 937 (2002) (emphasis added). The FERPA unambiguously conditions the grant of federal education funds on the educational institutions' obligation to respect the privacy of students and their parents. *See* 20 U.S.C. § 1232g(b)(2) (precluding schools from receiving federal funds if they maintain a policy or practice of disclosing education records without the student's consent). Based upon these clear and unambiguous terms, a participant *who accepts federal education funds* is well aware of the conditions imposed by the FERPA and is clearly able to ascertain what is expected of it. *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640 (1999) (quoting *Pennhurst State School and Hospital*, 451 U.S. at 17). Once the conditions and the funds are accepted, the school is indeed prohibited from systematically releasing education records without consent.[11]   Based upon the case

---

[11]We limit this conclusion, that the FERPA imposes a binding obligation on schools that accept federal funds, to federal government action to enforce the FERPA. In *Gonzaga University v. Doe*, the Supreme Court held that the FERPA does not create personal rights that

The district court was faced with questions of law and additional discovery would not aid in the resolution of those questions. Accordingly, the district court did not abuse its discretion when it denied *The Chronicle's* motion for discovery and a hearing.

## G.   Injunctive Relief

The district court permanently enjoined the Universities "from releasing student disciplinary records or any 'personally identifiable information' contained therein, as defined in [the] FERPA and its corresponding regulations, except as otherwise expressly permitted under [the] FERPA." *The Chronicle* contends that the DOE failed to establish the necessary prerequisites to secure a permanent injunction. It follows, according to *The Chronicle*, that the district court abused its discretion in granting such extraordinary relief without sufficient support.

"In order to obtain either a preliminary or permanent injunction, [a party] must demonstrate that failure to issue the injunction is likely to result in irreparable harm." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1068 (6th Cir. 1998). In addition, the party seeking injunctive relief generally must show that there is no other adequate remedy at law. *See id.* at 1067; *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-320 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.") (citations omitted). If injunctive relief is proper, it should be no broader than necessary to remedy the harm at issue. *Kallstrom,* 136 F.3d at 1069.

As an initial matter, the DOE contends that irreparable harm is presumed because the FERPA statutory scheme authorizes the government to obtain injunctive relief to prevent violations. In support of this proposition, the DOE cites *CSX Transp., Inc. v. Tennessee State Bd. of Equalization,* 964 F.2d 548, 551 (6th Cir. 1992), and other cases from the Eighth and Ninth Circuits. *See, e.g., United States v. Odessa Union*, 833 F.2d 172, 175 (9th Cir. 1987);

The district court's decision not to permit *The Chronicle* discovery before ruling on the motion for summary judgment and permanent injunction is reviewed by this Court for abuse of discretion. *See Good v. Ohio Edison Co.*, 149 F.3d 413, 422 (6th Cir. 1998). An evidentiary hearing typically is required before an injunction may be granted, but a hearing is not necessary where no triable issues of fact are involved. *See United States v. McGee*, 714 F.2d 607, 613 (6th Cir. 1983). "This court requires '[a] party invoking [Rule 56(f)] protections [to] do so in good faith by affirmatively demonstrating ... how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" *Good*, 149 F.3d at 422 (citing *Emmons v. McLaughlin*, 874 F.2d 351, 356 (6th Cir.1989) (additional citations omitted)).

*The Chronicle* lists three areas in which permitting discovery could have led to questions of material fact. *The Chronicle* contends that a close review of the UDB proceedings would have shed light on whether any or all of the disciplinary records generated are "education records" or "law enforcement records" within the meaning of FERPA. This question is answered by law not by fact. The Universities and the DOE conceded that some disciplinary proceedings address criminal conduct; through deference to the DOE's rules and regulations, we conclude as a matter of law that such records are education records nonetheless. Next, *The Chronicle* contends that additional discovery would have allowed it to test the DOE's claim of irreparable harm. As we discuss below, based upon the facts in the record, the harm in releasing student disciplinary records was indeed irreparable and no amount of discovery could possibly change that. The district court did not abuse its discretion in denying discovery. Finally, *The Chronicle* argues that it might have uncovered facts refuting the DOE's claim that criminal statistic availability satisfied *The Chronicle's* First Amendment rights. This information is irrelevant because student disciplinary proceedings are not criminal proceedings. The Constitution does not guarantee any rights to the records relating to student disciplinary proceedings.

law discussed above, we believe that, in the alternative to its statutory authority to sue, the United States may enforce the Universities' "contractual" obligations through the traditional means available at law. If those remedies are inadequate, then the government may seek contractual relief through a court of equity.

Finally, *The Chronicle* argues that the DOE has no power to prevent future violations of the FERPA because the statute only provides a remedy when the recipient *"is failing* to comply substantially with any requirement of law applicable to such funds." 20 U.S.C. § 1234c(a) (emphasis added). *The Chronicle* contends that because Congress couched violations in the present tense, it did not intend to provide prior restraints such as the permanent injunction granted in this case. We find these grammatical semantics unpersuasive. The administrative remedies outlined in the Act encompass various forms of forward-looking relief, designed to bring straying fund recipients into compliance. According to the enforcement provisions, the Secretary may withhold further payments under the program, compel compliance through a cease and desist order, and enter into a compliance agreement. None of these provisions imply a congressional intent to limit prospective relief; to the contrary, it appears that Congress envisioned a broad range of "prior restraint" remedies in the event that fund recipients failed to comport with their spending clause restraints. Accordingly, we hold that the DOE had standing to bring the case at bar.

### D. The FERPA, *Miami* and the Ohio Public Records Act

*The Chronicle* finds error in the district court's alleged refusal to respect the Ohio Supreme Court's interpretation of the Ohio Public Records Act, Ohio Rev. Code § 149.43. *The Chronicle* contends that, because the Ohio Supreme Court held that disciplinary records are not "education records" as

---

an individual may enforce through 42 U.S.C. § 1983. 536 U.S. ___, slip op. at 1, 2002 WL 1338070, at * 3 (June 20, 2002).

defined by the FERPA, it was unnecessary for the Court to decide whether the FERPA prohibits the disclosure of the requested records within the meaning of Ohio Rev. Code § 149.43. *State ex rel. Miami Student,* 680 N.E.2d at 958 n.1. The Ohio Supreme Court noted that "the Ohio Public Records Act is intended to be liberally construed 'to ensure that governmental records be open and made available to the public . . . subject to only a few very limited and narrow exceptions.'" *Id.* at 958. Among those exceptions is a provision that "excludes from the definition of public records those records 'the release of which is prohibited by state or federal law.'" *Id.* (citing Ohio Rev. Code § 149.43(A)(1)(v)). It follows, according to *The Chronicle*, that the district court invaded the province of the state court when it implicitly concluded that the FERPA "prohibited" the release of student disciplinary records. In reaching that conclusion, *The Chronicle* contends that the district court impermissibly broadened the state's otherwise narrow definition of the term "prohibit." We find several flaws in *The Chronicle*'s reasoning.

As an initial matter, *The Chronicle* concedes that the Ohio Supreme Court never reached the issue of whether the FERPA "prohibited" the release of education records, much less student disciplinary records as a subpart thereof. Instead, the Ohio Supreme Court misinterpreted a *federal* statute -- erroneously concluding that student disciplinary records were not "education records" as defined by the FERPA -- and prematurely halted its inquiry based upon that erroneous conclusion. We decline to speculate how the Ohio Supreme Court might otherwise have resolved this issue. Furthermore, whether the release of a particular record is prohibited by federal law necessarily implicates the interpretation of that federal law. The State of Ohio clearly recognized that necessity when it exempted from its definition of public records those records the release of which is prohibited *by federal law*. Ohio Rev. Code § 149.43(A)(1)(v). The prohibition finds its root in the federal law, not the Ohio Public Records Act. Accordingly, to the extent that the

without regard to their content while the latter are excluded from the definition of "education records" and receive no protection by the FERPA. In the records request that gave rise to the underlying suit and this appeal, *The Chronicle* asked Miami and Ohio State to please send "copies of records of all disciplinary proceedings handled by the university's internal judicial system for the calendar years 1995 and 1996." *The Chronicle Requests*, J.A. at 425-26. Even though some of the disciplinary proceedings may have addressed criminal offenses that also constitute violations of the Universities' rules or policies, the records from those proceedings are still protected "education records" within the meaning of the FERPA.[15]

## F.   The Right to Discovery

*The Chronicle* contends that the district court committed reversible error when it declined to allow discovery in this matter. In its motion to establish an order of procedure, *The Chronicle* asked the district court, pursuant to Fed. R. Civ. P. 56(f), for an order establishing a cut-off date for discovery, a deadline for motions, and a date for an evidentiary hearing. The district court denied this motion, concluding that there were no genuine issues of material fact. We agree.

---

[15] The holding in *Bauer v. Kincaid*, 759 F.Supp. 575 (W.D.Mo. 1991), does not affect this conclusion. Having closely reviewed *Bauer*, we believe that the records sought in that case, criminal investigation and incident records compiled and maintained by the Southwest Missouri State University Safety and Security Department, would likely fall within the *current* law enforcement unit records exception. In fact, the subsequent amendments to the FERPA and its regulations were likely designed to bring the *Bauer* documents clearly within the law enforcement unit records exception. *See* 20 U.S.C. § 1232g(a)(4)(B)(ii); 34 C.F.R. § 99.8(a)(1)(i),(ii). It goes without saying, however, that the records sought in *Bauer*, incident and criminal investigation reports gathered and maintained by a campus safety and security department, are entirely different than the records sought by *The Chronicle* in this case, *to wit*, copies of records of all disciplinary proceedings handled by the university's internal judicial system.

enforcement unit if it also performs other, non-law enforcement functions for the agency or institution, including investigation of incidents or conduct that constitutes or leads to a disciplinary action or proceedings against the student." *Id.* at §99.8(a)(2). In fact, "[r]ecords created and maintained by a law enforcement unit exclusively for a non-law enforcement purpose, such as a disciplinary action or proceeding conducted by the educational agency or institution" are not records of a law enforcement unit. *Id.* at § 99.8(b)(2)(ii). In addition, "[i]f a law enforcement unit of an institution creates a record for law enforcement purposes and provides a copy of that record to a . . . school official for use in a disciplinary proceeding, that copy is an 'education record' subject to FERPA if it is maintained by the . . . school official . . . ." 60 F.R. 3464, 3466. Finally, "[e]ducation records . . . do not lose their status as education records and remain subject to the Act, including the disclosure provisions . . ., while in the possession of the law enforcement unit." 34 C.F.R. at § 99.8(c)(2).

The DOE also defines disciplinary action or proceeding as "the investigation, adjudication, or imposition of sanctions by an educational agency or institution with respect to an infraction or violation of the internal rules of conduct applicable to students of the agency or institution." *Id.* at § 99.3. With these definitions in mind, the DOE states that, "[i]n contrast to law enforcement unit records, the Department has been legally constrained to treat the records of a disciplinary action or proceeding as 'education records' under FERPA (20 U.S.C. 1232g), that is, protected against non-consensual disclosure except in statutorily specified circumstances." 60 F.R. 3464, 3464. Finally, the DOE concludes that "all disciplinary records, including those related to non-academic or criminal misconduct by students, are 'education records' subject to FERPA." 60 F.R. 3464, 3465.

The agency draws a clear distinction between student disciplinary records and law enforcement unit records. The former are protected as "education records" under the FERPA

district court concluded that the FERPA prohibited the release of education records, it did so on federal grounds.[12]

In this case, the United States sought declaratory and injunctive relief against the Universities under the FERPA. Specifically, the United States asked the district court to determine whether student disciplinary records were "education records" as defined by FERPA. If the district court concluded, as it did, that student disciplinary records were "education records," then the United States also sought an injunction prohibiting the Universities from releasing student disciplinary records. The issues before the district court were of federal genesis and required no application of state law.

The Ohio Public Records Act and the *Miami* case were neither explicitly nor implicitly affected by the district court decision. As noted above, the Ohio Public Records Act does not require disclosure of records the release of which is prohibited by federal law. Ohio Rev. Code § 149.43(A)(1)(v). Based on that exception, the Ohio Public Records Act does not conflict with the FERPA and the state and federal statutes can coexist. Furthermore, the *Miami* case expressly adjudicated the relationship between two parties: Miami University and the editors of *The Miami Student*. *See State ex rel. Miami Student,* 680 N.E.2d at 957. We assume that the rights and responsibilities established in that case were satisfied long ago. Unlike the case at bar, the editors in the *Miami* case permitted Miami to redact significantly the

_____

[12]This conclusion is distinguishable from the Supreme Court's holding on the application of federal versus state law in *Wheeler v. Barrera*, 417 U.S. at 416-19. In that case, the Court held that state law controlled the decision of "whether federal aid is money 'donated to any state fund for public school purposes,' within the meaning of the Missouri Constitution, Art. 9, § 5." *Id.* The Missouri Constitution broadly described its fund pool for public schools and did not provide an explicit exception for funds received from the federal government. *Id.* In the case at bar, the Ohio legislators explicitly exempted from the definition of public records any records the release of which is prohibited by federal law.

student disciplinary records prior to disclosure and, in its mandamus, the Ohio Supreme Court expanded the list of items that Miami could redact. *Id.* at 959. After concluding that student disciplinary records were not "education records," the Court still permitted Miami to redact the following "personally identifiable information" in accord with the FERPA: the student's name; Social Security Number; student identification number; and the exact date and time of the alleged incident. *Id.* With these court-imposed redactions, the mandamus appears to comport with the FERPA's requirements. *See id.* at 960 (COOK, J. dissenting).

In the case *sub judice*, *The Chronicle* seeks records fraught with personally identifiable information and virtually untainted by redaction. Given the vast difference in the records sought by *The Chronicle*, it is by no means clear that the *Miami* case would support, without exception, the release of those records.

Finally, the district court was not bound by the Ohio Supreme Court's interpretation of "education records" under the FERPA. While federal courts must defer to a State court's interpretation of its own law, *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949), federal courts owe no deference to a state court's interpretation of a federal statute, *Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997) ("Notions of federalism do not require this court to follow a State court's holdings with respect to federal questions.").

Because the district court's conclusions were based entirely on federal law, and the federal law does not conflict with state law, we agree with the district court's conclusion that preemption is not implicated in this case.

definition. Relevant among those exceptions, the term "education records" does not include "records maintained by a law enforcement unit of the educational agency or institution that were created by that law enforcement unit for the purpose of law enforcement." 20 U.S.C. § 1232g(a)(4)(B)(ii). Because law enforcement records are by definition not education records, the FERPA does not protect law enforcement records or place restriction on their disclosure.

*The Chronicle* notes, without objection, that student disciplinary proceedings can and sometimes do involve serious criminal conduct. Based upon that fact, it argues that student disciplinary records addressing such conduct are law enforcement records and should be disclosed to the public. Faced with this argument and the fact that this provision is somewhat ambiguous, the district court turned to the DOE's regulations for interpretive assistance. We agree with this approach.

In *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837 (1984), the Supreme Court outlined a two-step procedure to determine Congressional intent in a statute. First, *Chevron* requires courts to determine whether Congress has directly spoken to the precise question at issue. *Id.* at 842-43. If so, then this panel must give effect to the unambiguously expressed intent of Congress. *Id.* If the statute is silent or ambiguous with respect to the specific issue, this Court must defer to the agency's interpretation as long as it is based on a permissible construction of the statute. *Id.*

We find the following definitions and interpretations to be reasonable and permissible constructions of the relevant statute. "A [l]aw enforcement unit means any . . . component of an educational agency or institution . . . that is officially authorized or designated by that agency or institution to [e]nforce any local, State, or Federal law . . . or [m]aintain the physical security and safety of the agency or institution." 34 C.F.R. § 99.8(a)(1)(i),(ii). "A component of an educational agency or institution does not lose its status as a law

## E.   Student Disciplinary Records, Education Records and the FERPA

*The Chronicle* argues that the district court erred in concluding that student disciplinary records are "education records" within the contemplation of FERPA. *The Chronicle* states that there is no evidence that Congress ever intended the FERPA to protect records other than those records relating to individual student academic performance, financial aid or scholastic probation. In addition, *The Chronicle* contends that student disciplinary records involving criminal offenses should be construed as unprotected law enforcement records. Otherwise, the FERPA affords "special" privacy rights to students that the general public does not enjoy.

As noted above, we review *de novo* issues of statutory interpretation. *Walton,* 192 F.3d at 592. "We read statutes and regulations with an eye to their straightforward and commonsense meanings." *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 910 (6th Cir.2000). "When we can discern an unambiguous and plain meaning from the language of a statute, our task is at an end." *Bartlik v. U.S. Dept. of Labor*, 62 F.3d 163, 166 (6th Cir.1995). With these principles in hand, we turn to the words of Congress for guidance on this issue.

The FERPA broadly defines "education records" as "those records, files, documents, and other materials which (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A). Under a plain language interpretation of the FERPA, student disciplinary records are education records because they directly relate to a student and are kept by that student's university. Notably, Congress made no content-based judgments with regard to its "education records" definition. We find nothing in the statute or its legislative history to the contrary, and the various state court and federal district court cases cited by *The Chronicle* do not sway our

---

again, this provision explicitly recognizes that student disciplinary records are education records and therefore are protected from disclosure. In spite of that protection, Congress concluded that a parent, not the general public, had a right to know about such violations.

If Congress believed that student disciplinary records were not education records under the FERPA, then these sections would be superfluous. It is well established that a court must avoid an interpretation of a statutory provision that renders other provisions superfluous. *Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 877 (1991). Congress is the appropriate body to address whether student disciplinary records should be open to the public and under what circumstances. Congress has proven through the exemptions discussed above that, when faced with a situation justifying limited student disciplinary record disclosure, it is willing and able to carefully draft a provision permitting such disclosure. Until Congress broadens these exemptions or otherwise alters the clear statutory language, we must conclude that student disciplinary records remain protected under the term "education records."[14]

In addition to the exemptions discussed above, Congress also provided some exceptions to the "education records"

---

[14] If we were unable to determine whether student disciplinary records were education records from the plain language in the statute, we would of course defer to a reasonable agency interpretation of the issue. In 1995, the DOE made the following conclusion:

> Based on the broad definition of 'education records,' which includes those records, files, documents, and other materials that contain information directly related to a student, except those that are specifically excluded by statute, all disciplinary records, including those related to non-academic or criminal misconduct by students, are 'education records' subject to FERPA.

60 F.R. 3464, 3465 (1995). Given the fact that the DOE reached the same conclusion that we did, we find it to be a well reasoned and permissible construction of the statutory language and we would adopt the DOE's construction.

conclusion.[13]  In fact, a detailed study of the statute and its evolution by amendment reveals that Congress intends to include student disciplinary records within the meaning of "education records" as defined by the FERPA. This intention is evinced by a review of the express statutory exemptions from privacy and exceptions to the definition of "education records."

The FERPA sanctions the release of certain student disciplinary records in several discrete situations through exemption.  The Act does not prohibit disclosure "*to an alleged victim* of any crime of violence . . . or a nonforcible sex offense, the final results of any disciplinary proceeding conducted by the institution against the alleged perpetrator . . . ." 20 U.S.C. § 1232g(b)(6)(A) (emphasis added).  The *public generally* may be informed of "the final results of any disciplinary proceeding conducted by [an] institution against a student who is an alleged perpetrator of any crime of violence . . . or a nonforcible sex offense, if the institution determines . . . that the student committed a violation of the institution's rules or policies with respect to such crime or offense." *Id.* at § 1232g(b)(6)(B). "[T]he final results of any disciplinary proceeding (i) shall include only the name of the student, the violation committed, and any sanction imposed by the institution on that student; and (ii) may include the name of any other student, such as a victim or witness, only with the written consent of that other student." *Id.* at § 1232g(b)(6)(C).

These two exemptions clearly evolve from a base Congressional assumption that student disciplinary records are "education records" and thereby protected from disclosure. Working from that base, Congress selected two particular situations in which otherwise protected student disciplinary records may be released.  And even then, Congress significantly limits the amount of information that

---

[13]Some exemptions and exceptions, both in the statute and the DOE's regulations, have been added in response to those cases cited by *The Chronicle*.

an institution may release and the people to whom the institution may release such information.  In the first provision, Congress balanced the privacy interests of an alleged perpetrator of any crime of violence or nonforcible sex offense with the rights of the alleged victim of such a crime and concluded that the right of an alleged victim to know the outcome of a student disciplinary proceeding, regardless of the result, outweighed the alleged perpetrator's privacy interest in that proceeding. Congress also determined that, if the institution determines that an alleged perpetrator violated the institution's rules with respect to any crime of violence or nonforcible sex offense, then the alleged perpetrator's privacy interests are trumped by the public's right to know about such violations.  In so doing, Congress acknowledged that student disciplinary records are protected from disclosure but, based on competing public interests, carefully permitted schools to release bits of that information while retaining a protected status for the remainder.

Next, the disciplinary records of a student posing a significant risk to the safety or well-being of that student, other students, or other members of the school community may be disclosed to individuals having a "legitimate educational interest[] in the behavior of the student." *Id.* at § 1232g(h)(2).  This provision recognizes that a student has a privacy interest in his or her disciplinary records, even if those records reflect that the student poses a significant safety risk.  Congress concluded that, although such information may be included in the student's education record, schools may disclose those disciplinary records to teachers and school officials.  Obviously this narrow exemption does not contemplate release of the student disciplinary records to the general public.

Finally, if an institution of higher education determines that a student, under the age of twenty-one, "has committed a disciplinary violation with respect to" the use or possession of alcohol or a controlled substance, then the institution may disclose information regarding such violation to a parent or legal guardian of the student. *Id.* at § 1232g(i)(1).  Once