**AN UNINCORPORATED OPERATING DIVISION OF INDIANA NEWSPAPERS, INC., Indiana Corporation d/b/a The Indianapolis Star, Appellant–Plaintiff,**

v.

**THE TRUSTEES OF INDIANA UNIVERSITY, Appellees–Defendants.**

**No. 53A04–0112–CV–527.**

Court of Appeals of Indiana.

May 2, 2003.

Kevin W. Betz, Betz & Associates, Indianapolis, IN, Attorney for Appellant.

Ellen E. Boshkoff, Scott D. Himsel, Baker & Daniels, Indianapolis, IN, Attorneys for Appellee.

Stephen A. Key, The Hoosier State Press Association Foundation, Indianapolis, IN, Attorney for Amicus Curiae.

## OPINION

SULLIVAN, Judge.

Appellant–Plaintiff, an Unincorporated Operating Division of Indiana Newspapers, Inc., Indiana Corp. d/b/a The Indianapolis Star ("the Star"), challenges the trial court's grant of summary judgment in favor of Appellee–Defendants, the Trustees of Indiana University ("the Trustees") in the Star's suit seeking access to certain materials held by the Trustees. Upon appeal, the Star challenges the trial court's grant of summary judgment upon several grounds, which we renumber and restate as follows:

I. Whether federal law requires the materials sought by the Star to be kept confidential;

II. Whether the materials sought are deliberative materials excepted from public disclosure requirements;

III. Whether the materials sought are required to be disclosed by statute; and

IV. Whether the Trustees' public release of certain information precludes them from claiming any exceptions to the public disclosure statute.

We affirm in part, reverse in part, and remand.

The facts in the light most favorable to the non-moving party reveal that in March of 2000, Neil Reed, a former student basketball player for Indiana University, appeared on a television program and accused then-Indiana University basketball coach Bob Knight of inappropriate behavior, including choking Reed during basketball practice. Shortly following these allegations, a videotape surfaced which showed Knight extending his arm and contacting or grabbing Reed by the throat during a taped practice session. In response to these events, Indiana University President Myles Brand appointed University Trustees Frederick Eichhorn and John Walda to investigate the veracity of the allegations. Eichhorn and Walda were specifically given the task of investigating the following: the alleged choking of and other abuses directed toward Reed; whether Knight verbally abused Brand and removed him from a session of basketball practice; an incident in which Knight allegedly displayed soiled toilet paper to members of the basketball team; and any other allegations which might arise during the course of the investigation.

Walda hired a videotape expert and a private investigator to assist in the investigation. During the investigation, although not directed by Brand to do so, Eichhorn and Walda produced several documents which are at issue in the present case. These documents consist of letters summarizing witness interviews, transcripts of interviews, notes taken during interviews, a letter from a witness, a memorandum prepared at Walda's request by a former student regarding Reed's allegations, and a document consisting of the names of witnesses for the Reed investigation, including notes made by the private investigator. Although variously referred to by the parties as the Knight Disciplinary Records, or the Reed Investigatory Materials, we will refer to the material produced as part of the investigation of Reed's allegations as the "Reed materials."

On May 3, 2000, Eichhorn and Walda met with Brand in Bloomington and gave an oral report of the investigation, drawing in part upon information contained in the Reed materials. On May 14, 2000, Brand met with other Trustees, including Eichhorn and Walda, where, based in part upon the Reed materials, information concerning the investigation was again relayed.

On May 15, 2000, based in part upon the information he had received as a result of the investigation, Brand decided to discipline and sanction Knight and announced this decision in a televised press conference. In addition to a fine and suspension, Brand imposed what was termed a "zero-tolerance" policy which prohibited "inappropriate physical contact" by Knight. Eichhorn and Walda prepared a "Summary Report of the Trustee Review Regarding Neil Reed Allegations Concerning the Conduct of Coach Bob Knight" which reviewed the findings and conclusions of the Reed investigation. The University also drafted a document titled "Knight Sanctions" which also summarized the findings and conclusions of the investigation and announced the sanctions imposed upon Knight. The Knight Sanctions were released to the public. Brand also created a Code of Conduct Commission to "look at

the general set of issues surrounding employment and ethical approaches by coaches, student athletes, athletic directors, or anyone to do with athletics, as well as to coordinate the various codes of conduct that already existed." Appellant's Appendix at 34.

In September of 2000, the Vice President of Public Affairs for Indiana University Christopher Simpson informed Brand that a freshman student had made allegations that Knight had inappropriate physical contact with the student. Brand then asked the University's chief counsel, Dottie Frapwell, to investigate the allegations. Frapwell instructed James Kennedy to direct the Indiana University Police Department ("IUPD") to investigate the freshman student's allegations, which "sounded like it could be a battery...." Appellant's App. at 145. IUPD interviewed several witnesses, including the student and Knight. We will refer to the materials generated in this investigation as the "IUPD materials." These materials are maintained by IUPD and are not physically kept in Knight's personnel file. Following the investigation, Brand held a meeting at his residence in Bloomington with Eichhorn, Frapwell, Kennedy, Simpson, Vice President Terry Clapacs, Bill Stephan, and Brand's wife, Peg Brand,[1] concerning the IUPD investigation. At this meeting, the information garnered during the IUPD investigation was relayed to Brand. The information contained in the IUPD materials was a factor supporting the decision to terminate Knight's employment. The IUPD materials were turned over to the Monroe County Prosecutor's Office, which decided not to file any criminal charges.

During a televised press conference on September 10, 2000, Brand announced the decision to terminate Knight. The University also publicly issued two documents, entitled "Remarks of President Myles Brand," and "IU announces removal of Basketball Coach Bob Knight."

During the Reed investigation, the Star made ten requests for access to records maintained by the Trustees, and the Trustees produced over forty documents in response thereto. On May 18, 2000, the Star requested, pursuant to the Indiana Access to Public Records Act ("APRA"),[2] "copies of any notes taken during the course of the [Reed] investigation, information gathered during the course of the investigation and reports written as a result of the investigation." Appellee's App. at 13. In response, the Trustees produced the "Summary Report" but denied access to the Reed materials. In doing so, the Trustees claimed that the Reed materials were attorney work product[3] and also protected by various exceptions to the general policy of disclosure as provided in APRA. After the Trustees denied the Star's request for access, the Star filed a complaint with the Office of the Public Access Counselor,[4] in which it inquired as to whether the Trustees had waived any of the claimed exceptions to public access.[5] The informal opin-

---

1. Ms. Brand was a professor employed by Indiana University.

2. *See* Ind.Code §§ 5–14–3–1 through 5–14–3–10.

3. The trial court determined that a genuine issue of material fact existed as to whether Eichhorn and Walda were acting as attorneys for the University. However, as the trial court concluded that the materials at issue were protected from disclosure for other rea-

sons, it granted summary judgment in favor of the Trustees.

4. *See* Ind.Code §§ 5–14–4–1 through 5–14–5–12.

5. Because the Star filed the complaint more than thirty days after the Trustees had denied access, the Access Counselor deemed the complaint untimely and treated the complaint as an informal inquiry. *See* Ind.Code § 5–14–5–7 (Burns Code Ed. Repl.2001) (formal com-

ion of the Access Counselor's Office was that, based upon the circumstances under which the Trustees had disclosed the Summary Report to the media and the public, the Trustees had not waived the APRA exceptions upon which it based its withholding of the Reed materials.

On October 16, 2000, the Star made a request for access to Knight's personnel file.[6] In response, the Trustees produced "all documents to which the Star was entitled, including President Brand's September 11, 2000, letter removing Knight," but denied access to the IUPD materials. Appellee's App. at 10. The Star again filed an inquiry with the Access Counselor's Office, but the Office declined to issue another advisory opinion.

On January 2, 2001, in response to the Trustees' denial of access, the Star filed a complaint alleging a violation of APRA by the Trustees and seeking access to the Reed and IUPD materials. On March 2, 2001, the Trustees moved for summary judgment. The Star filed its response to this motion on July 3, 2001. The Trustees filed a reply to the Star's response on August 7, 2001, and the Star filed a sur-reply on August 10, 2001. Also on August 10, 2001, the trial court held a hearing on the summary judgment motion. The trial court reviewed in camera the disputed materials. Thereafter, on November 5, 2001, the trial court granted summary judgment in favor of the Trustees, denying the Star access to the disputed materials. The trial court's order also contained specific findings of fact and conclusions of law. The Star filed its Notice of Appeal on December 3, 2001.

## Summary Judgment

 Summary judgment is appropriate only if the designated evidentiary material demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Title Search Co., Inc. v. 1st Source Bank,* 765 N.E.2d 167, 171 (Ind.Ct.App.2002), *trans. denied.* Upon appeal, we apply the same standard as the trial court and resolve disputed facts or inferences in favor of the non-moving party. *Id.* This court and the trial court are bound to consider only those matters which were designated to the trial court. *Markley Enters., Inc. v. Grover,* 716 N.E.2d 559, 564 (Ind.Ct.App. 1999). The moving party bears the burden of establishing, prima facie, that no genuine issues of material fact exist and that he or she is entitled to judgment as a matter of law. *Title Search,* 765 N.E.2d at 171. In addition, the party appealing a grant of summary judgment bears the burden of persuading us that the trial court erred. *Id.*

 Here, the trial court entered findings of fact and conclusions of law. Trial courts are not required to do so by Trial Rule 56(C). *Turner v. Stuck,* 778 N.E.2d 429, 431 (Ind.Ct.App.2002). The trial court's findings and conclusions are not binding upon this court, but do facilitate appellate review and offer insight into the trial court's rationale for its decision. *Id.* On review, we will affirm the summary judgment if it is sustainable upon any theory or basis found in the record. *Id.*

## I

### *Indiana Access to Public Records Act*

Pursuant to the Indiana Access to Public Records Act, the Star seeks access to several documents held by the Trustees. The

---

plaints must be filed with Access Counselor's Office no later than thirty days after denial of access by public agency).

6. As discussed *infra,* the Star claims that the Reed and IUPD materials must be disclosed as part of Knight's personnel file.

first section of APRA sets forth the public policy underlying the Act:

"A fundamental philosophy of the American constitutional form of representative government is that government is the servant of the people and not their master. Accordingly, it is the public policy of the state that all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees. Providing persons with the information is an essential function of a representative government and an integral part of the routine duties of public officials and employees, whose duty it is to provide the information. This chapter shall be liberally construed to implement this policy and place the burden of proof for the nondisclosure of a public record on the public agency that would deny access to the record and not on the person seeking to inspect and copy the record." Ind.Code § 5–14–3–1 (Burns Code Ed. Repl.2001).

Section 3 of APRA provides, "Any person may inspect and copy the public records of any public agency during the regular business hours of the agency, except as provided in section 4 of this chapter." [7] Ind.Code § 5–14–3–3(a) (Burns Code Ed. Repl. 2001). Section 4 in turn sets forth several exceptions to the disclosure requirement of section 3. Ind.Code § 5–14–3–4 (Burns Code Ed. Supp.2002). Section 4(a) sets forth mandatory exceptions to public access, and section 4(b) sets forth exceptions which may be invoked at the discretion of the public agency.[8]

■ If a public agency denies the request to inspect or copy public records, the party who has been denied access may file an action to compel the public agency to permit the party to inspect and copy the records. Ind.Code § 5–14–3–9(d) (Burns Code Ed. Repl.2001). In such an action, section 9 states:

"(e) The [circuit or superior] court shall determine the matter de novo, with the burden of proof on the public agency to sustain its denial. If the issue in de novo review under this section is whether a public agency properly denied access to a public record because the record is exempted under section 4(a) of this chapter, the public agency meets its burden of proof under this subsection by establishing the content of the record with adequate specificity and not by relying on a conclusory statement or affidavit.

(f) If the issue in a de novo review under this section is whether a public agency properly denied access to a public record because the record is exempted under section 4(b) of this chapter:

(1) the public agency meets its burden of proof under this subsection by:

(A) proving that the record falls within any one (1) of the cate-

---

7. Neither party suggests that Indiana University is not a public agency within the meaning of APRA. *See Robinson v. Indiana Univ.*, 659 N.E.2d 153, 155 (Ind.Ct.App.1995) (applying APRA to Indiana University and noting that the parties did not dispute that the University was a public agency), *trans. denied*. Given the broad definition of public agency set forth in section 2 of APRA, we see no reason to question whether the University is a public agency. *See* Ind.Code § 5–14–3–2 (Burns Code Ed. Supp.2002) (defining "public agen-

cy" to include "[a]ny board, commission, department, division, bureau, committee, agency, office, instrumentality, or authority, by whatever name designated, exercising any part of the executive, administrative, judicial, or legislative power of the state").

8. The Star makes no argument that the Trustees abused their discretion in denying access to the materials in question, but instead argues that the Trustees must disclose the materials it seeks.

gories of exempted records under section 4(b) of this chapter; and

(B) establishing the content of the record with adequate specificity and not by relying on a conclusory statement or affidavit; and

(2) a person requesting access to a public record meets the person's burden of proof under this subsection by proving that the denial of access is arbitrary or capricious.

(g) the court may review the public record in camera to determine whether any part of it may be withheld under this chapter." *Id.*[9]

■ Section 6(a) of APRA provides, "If a public record contains discloseable and nondiscloseable information, the public agency *shall,* upon receipt of a request under this chapter, separate the material that may be disclosed and make it available for inspection and copying." Ind. Code § 5–14–3–6(a) (Burns Code Ed. Repl. 2001) (emphasis supplied).[10] *See also Heltzel v. Thomas,* 516 N.E.2d 103, 106 (Ind.Ct.App.1987) (noting the mandatory nature of I.C. § 5–14–3–6), *trans. denied.* In the present case, the trial court viewed the records in question in camera as authorized by section 9(g) and determined, as a matter of law, that the records were excepted from public disclosure for various reasons, which the Star now challenges. Although we must liberally construe APRA to implement its policy of public access, we cannot contravene or ignore the specific exceptions to disclosure specified by the legislature. *See Heltzel,* 516 N.E.2d at 106.

## II

### *Investigatory Records Exception*

The trial court determined that the IUPD materials were excepted from public disclosure pursuant to I.C. § 5–14–3–4(b)(1), which states that "[i]nvestigatory records of law enforcement agencies" may be excepted from disclosure at the discretion of the public agency. The Star does not directly challenge the trial court's resolution of this matter. Instead the Star's main argument is that, even if the IUPD materials were investigatory files within the meaning of section 4(b)(1), it is nevertheless entitled to access pursuant to section 4(b)(8)(C). We address this contention *infra.*

■ Nonetheless, the Star does posit that the IUPD materials might not be nondiscloseable investigatory records because there was designated evidence that there was little or no chance of prosecution. The Star also claims that there is no reason to protect " 'yellowing documents contained in long-closed files.' " Appellant's Br. at 40 n. 5 (quoting *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 870 (D.C.Cir.1980)). The plain language of section 4(b)(1), however, makes no mention of the likelihood of prosecution. Moreover, APRA contains a separate provision for the disclosure of aging documents, which is inapplicable here. *See* I.C. § 5–14–3–4(e) (requiring access to all records, except those concerning an adoption, seventy-five years after the creation of the record).

It cannot be doubted that the IUPD materials are investigatory in nature and

---

**9.** Although an exemption claimed under section 4(b) would appear to place a burden of proof upon both the agency *and* the person seeking access, we conclude no burden falls upon the person seeking access unless and until the agency has prima facie carried its burden of proof.

**10.** Section 6(a) refers to a request made under "this chapter," i.e., I.C. 5–14–3, which is APRA. Thus, the mandate of section 6(a) is triggered by a request for access under APRA and does not require a specific request for separation or redaction by the party seeking access.

that IUPD is a law enforcement agency. Section 2 of APRA defines "investigatory record" as "information compiled in the course of the investigation of a crime." I.C. § 5–14–3–2. The Star does not claim that the IUPD files do not meet this definition. Section 2 also defines "law enforcement agency" as "an agency or a department of any level of government that engages in the investigation, apprehension, arrest, or prosecution of alleged criminal offenders...." *Id.* The Star does not claim that IUPD does not meet this definition.

Because the plain language of section 4(b)(1) states that, subject to certain exceptions not applicable here, investigatory records of law enforcement agencies shall be excepted from public disclosure at the discretion of the public agency, we hold that the materials generated by IUPD in the course of its investigation are excepted from public disclosure at the Trustees' discretion. As the Star makes no argument that the Trustees abused this discretion, the trial court did not err in concluding that the Star could not compel the Trustees to disclose the IUPD materials.[11]

## III

### *The Family Educational Rights and Privacy Act*

APRA excepts from public disclosure those public records which are required to be kept confidential by federal law. I.C. § 5–14–3–4(a)(3). The Star challenges the trial court's determination that the federal Family Educational Rights and Privacy

Act of 1974 ("FERPA")[12] requires the Reed materials to remain confidential and that the Reed materials are therefore excepted from APRA's disclosure requirement. Specifically, the trial court concluded that the Reed materials were protected from public disclosure by FERPA in that "they are 'educational records' and contain 'personal identifiable information' of past and present students and parents of students of Indiana University...." Appellant's App. at 14.

The relevant portion of FERPA reads: "No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein other than directory information, as defined in paragraph (5) of subsection (a) of this section) of students without the written consent of their parents to any individual, agency, or organization...." 20 U.S.C. § 1232g(b)(1).

### A. *Does FERPA Require Confidentiality?*

We first address a threshold issue not directly addressed by the parties, i.e., whether FERPA is a federal law which "requires" records to be kept confidential. Only if this is so does APRA require nondisclosure. *See* I.C. § 5–14–3–4(a)(3). In the strictest sense, FERPA does not "require" educational institutions to do or not do anything, but instead operates to withhold federal funding to those institutions

---

11. The Star also claims that the trial court erred in determining that the IUPD materials were protected from disclosure by the deliberative materials exception contained in I.C. § 5–14–3–4(b)(6), when no such exception was ever claimed by the Trustees. Given our conclusion that the IUPD materials are excepted from disclosure by section 4(b)(1), this is at most harmless error.

12. FERPA is codified at 20 U.S.C. § 1232g. As noted by this court in *Meury v. Eagle–Union Cmty. Sch. Corp.,* 714 N.E.2d 233, 236 n. 2 (Ind.Ct.App.1999), *trans. denied,* section 1232g is actually entitled "Family educational and privacy rights." Nonetheless, it is commonly referred to as FERPA; it has also been referred to as "the Buckley Amendment" or the "Buckley/Pell Amendment." *Id.*

which have a policy or practice of permitting the release of education records without parental or student consent. 20 U.S.C. § 1232g(b)(1).

In *Gonzaga Univ. v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), the United States Supreme Court held that FERPA's non-disclosure provisions create no personal right to enforce pursuant to 42 U.S.C. § 1983. In so holding, the Court observed that FERPA's non-disclosure provisions speak only in terms of institutional policy and practice, not individual instances of disclosure. 122 S.Ct. at 2271. One could conclude from this that isolated instances of non-authorized disclosure would not be in violation of FERPA and not jeopardize a school's federal funding. If so, FERPA would not require education records to be kept confidential. However, if we were to hold for this reason that FERPA was not a federal law requiring education records to be kept confidential, public disclosure of such materials could soon become a commonplace occurrence. In such a situation, one might then say that a school has a "policy or practice" of non-authorized disclosure of education records, which would violate FERPA and endanger federal funding.

As observed by the court in *DTH Publ'g Corp. v. Univ. of N. Carolina*, 128 N.C.App. 534, 496 S.E.2d 8, 12 (1998), although FERPA does not specifically use such terms as " 'privileged' and 'confidential' ... it clearly expresses the federal policy that student education records should not be widely disseminated to the public and, except in certain enumerated circumstances, should not be released without proper consent." We agree with this reasoning and hold that, for purposes of I.C. § 5–14–3–4(a)(3), FERPA is a federal law which requires education records

to be kept confidential. *See also U.S. v. Miami Univ.*, 294 F.3d 797, 809 (6th Cir. 2002) (noting that once federal funding and the conditions of FERPA are accepted by a school, the school is "indeed prohibited" from systematic non-consensual release of education records).

### B. Education Records

■ Having determined that FERPA requires education records to be kept confidential, the question becomes whether the Reed materials are encompassed by the term "education records." FERPA defines education records as "those records, files, documents, and other materials which ... (i) contain information directly related to a student; and ... (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A). Education records do not include:

"(i) records of instructional, supervisory, and administrative personnel and educational personnel ancillary thereto which are in the sole possession of the maker thereof and which are not accessible or revealed to any other person except a substitute;

(ii) records maintained by a law enforcement unit of the educational agency or institution that were created by that law enforcement unit for the purpose of law enforcement;

(iii) in the case of persons who are employed by an educational agency or institution but who are not in attendance at such agency or institution, records made and maintained in the normal course of business which relate exclusively to such person in that person's capacity as an employee and are not available for use for any other purpose." [13]
§ 1232g(a)(4)(B).

---

**13.** Amicus curiae argues that the Reed materials are not education records in that the

materials fall within what it terms the "employee records" exception contained in

Upon appeal, the Star argues that the trial court erred in concluding that all of the Reed materials were education records and are therefore required to be kept confidential by FERPA.

The scope of the term "education records" as used in FERPA has been addressed by several courts, some giving the term a narrow definition, others giving it a broader definition. *Compare Red & Black Publ'g Co. v. Bd. of Regents*, 262 Ga. 848, 427 S.E.2d 257 (1993) (holding that records relating to a student court were not education records), *and State ex rel. Miami Student v. Miami Univ.*, 79 Ohio St.3d 168, 680 N.E.2d 956 (1997) (holding that university students' redacted disciplinary records were not education records), *cert. denied* 522 U.S. 1022, 118 S.Ct. 616, 139 L.Ed.2d 502, *with DTH Publ'g Corp.*, 128 N.C.App. 534, 496 S.E.2d 8 (holding that student information divulged in undergraduate court proceedings constituted education records), *and Miami Univ.*, 294 F.3d 797 (holding that student disciplinary records "virtually untainted by redaction" were education records).

The question of the scope of the term "education records" was recently before the United States Supreme Court in *Owasso Indep. Sch. Dist. v. Falvo*, 534 U.S. 426, 122 S.Ct. 934, 151 L.Ed.2d 896 (2002). In *Falvo*, the Court held that peer-grading procedures used by the defendant school district did not violate FERPA because the peer-graded papers were not education records. *Id.* at 430, 122 S.Ct. 934. The Court acknowledged that the papers contained information directly relating to a student and met the first requirement for an education record. *Id.* at 431, 122 S.Ct. 934. The Court held, however, that the peer-graded papers were not "maintained" by the school or a person acting for the school. *Id.* at 433, 122 S.Ct. 934.

The Court held that the word "maintain" suggested that education records will be kept in a filing cabinet or on a permanent secure database, and that it was "fanciful to say that [the students] maintain the papers in the same way the registrar maintains a student's folder in a permanent file." *Id.* The Court also held that the students were not "acting for" the school when they followed their teacher's instructions to peer-grade a test, in that "[c]orrecting a classmate's work can be as much a part of the assignment as taking the test itself." *Id.* According to the *Falvo* Court, the phrase " 'acting for' connotes agents of the school, such as teachers, administrators, and other school employees." *Id.* The Court also stated:

> "FERPA requires 'a record' of access for each pupil. This single record must be kept 'with the education records.' This suggests Congress contemplated that the education records would be kept in one place with a single record of access. By describing a 'school official' and 'his assistants' as the personnel responsible for the custody of the records, FERPA implies that education records are institutional records kept by a single central custodian, such as a registrar, not individual assignments handled by many student graders in their separate classrooms." *Id.* at 434–35, 122 S.Ct. 934.

The Star argues in its reply brief that the Reed materials are maintained by

§ 1232g(a)(4)(B)(iii). We disagree. This exception requires that the records in question be made and kept in the normal course of business. Here, however, the Star admits that the investigation was the first of its kind in Knight's tenure. Appellant's Br. at 45.

This exception also requires that the materials relate exclusively to the employee in his capacity as an employee. As discussed more fully below, the Reed materials do not relate exclusively to Knight, but also contain information concerning others, including students.

Trustees Eichhorn and Walda, not by the University, and that the Reed materials are therefore not education records as defined by FERPA. Although the Reed materials are not maintained by a central custodian, *Falvo* should not be read to mean that all records not maintained by a registrar or central custodian cannot be education records. Otherwise there would have been little reason for the Court to mention that a person "acting for" the school connoted agents of the school such as teachers, administrators, and other employees. Here, Eichhorn and Walda, who are University Trustees, were instructed by the President of the University to conduct the Reed investigation and collected the Reed materials as a result. Eichhorn and Walda were clearly acting for the University in maintaining these materials.

This leads us to the issue of whether the Reed materials contain information directly related to a student. The Star cites *Miami Student, supra,* to support its argument that the Reed materials do not. In *Miami Student,* the Ohio Supreme Court held that university student disciplinary records were not education records under FERPA, and therefore not exempt from Ohio's Public Records Act, which, like APRA, excluded from the definition of public records those records prohibited to be released by state or federal law. *See* 79 Ohio St.3d at 170, 680 N.E.2d 956 (citing Ohio Rev.Code Ann. § 149.43). The court stated that the disciplinary records sought were non-academic in nature and did not contain educationally related information such as grades, academic data, scholastic performance, or financial aid information. *Id.* at 171–72, 680 N.E.2d 956. Therefore, the court held that the records were not education records for purposes of FERPA.

In *Miami Student,* the newspaper seeking access to the records had, in its requests for access, not sought disclosure of personal information such as names, Social Security numbers, student identification numbers, or other information which conveyed the identity of the accused or convicted party. The university had deleted this information along with the age and sex of the students charged, the dates, times, and location of the alleged incidents, and the disposition of certain proceedings. The court held that the university could properly delete from the disclosed records the student's name, Social Security number, student identification number, and the exact date and time of the alleged incident, as this could lead to the identity of the student. *Id.* at 172, 680 N.E.2d 956. The court held that the university must disclose "the general location of the incident, the age and sex of the student (which does not identify the student), the nature of the offense, and the type of disciplinary penalty imposed." *Id.*

The Trustees claim that the *Miami Student* case is no longer valid precedent, and cite *Miami University, supra,* for support. The *Miami University* case arose out of the circumstances following the Ohio Supreme Court's decision in *Miami Student.* Following the *Miami Student* decision, "The Chronicle of Higher Education" sought disciplinary records from both Miami University and Ohio State University. However, unlike the newspaper in *Miami Student,* the Chronicle requested the records with names intact and minimal redaction. Upon receipt of the request, Miami University contacted the federal Department of Education ("DOE") to inform the DOE that it might not be able to comply with FERPA. The DOE informed Miami University that the Ohio Supreme Court was incorrect in holding that disciplinary records were not education records. When the DOE learned that the universities planned to comply with the Chronicle's requests, it sought declaratory and injunctive relief in federal court. The District

Court granted the DOE's motion for summary judgment and permanently enjoined the universities from releasing student disciplinary records in violation of FERPA. *U.S. v. Miami Univ.*, 91 F.Supp.2d 1132, 1160 (S.D.Ohio 2000).

Upon appeal, the Sixth Circuit Court of Appeals affirmed the District Court and held that the Ohio Public Records Act and FERPA could coexist. *Miami Univ.*, 294 F.3d at 811. Here, the Trustees claim that the *Miami Student* case is no longer valid precedent. To be sure, the District Court criticized and disagreed with the Ohio Supreme Court's conclusion that student disciplinary records were not education records. *Miami Univ.*, 91 F.Supp.2d at 1149 n. 17. The Sixth Circuit Court of Appeals also agreed that student disciplinary records were education records. *Miami Univ.*, 294 F.3d at 812. Nevertheless, it distinguished the situation before it and the one which was before the Ohio Supreme Court:

"We assume that the rights and responsibilities established in [the *Miami Student* ] case were satisfied long ago. Unlike the case at bar, the editors in the Miami case permitted Miami to redact significantly the student disciplinary records prior to disclosure and, in its mandamus, the Ohio Supreme Court expanded the list of items that Miami could redact. After concluding that student disciplinary records were not 'education records,' the Court still permitted Miami to redact the following 'personally identifiable information' in accord with the FERPA: the student's name; Social Security Number; student identification number; and the exact date and time of the alleged incident. *With these court-imposed redactions, the mandamus appears to comport with the FERPA's requirements.*

In the case sub judice, The Chronicle seeks records fraught with personally identifiable information and virtually untainted by redaction. Given the vast difference in the records sought by The Chronicle, it is by no means clear that the [*Miami Student* ] case would support, without exception, the release of those records." *Id.* at 811 (emphasis supplied) (citations omitted).

The Sixth Circuit then upheld the permanent injunction issued by the District Court. The Court also relied upon a conclusion reached by the DOE in 1995 that "all disciplinary records, including those related to non-academic or criminal misconduct by students, are 'education records' subject to FERPA." *Id.* at 813 n. 14.

From this, we can discern that the Sixth Circuit disagreed with the Ohio Supreme Court's narrow definition of education records, and that according to the Sixth Circuit and the DOE, student disciplinary records are education records which must remain confidential pursuant to FERPA. However, we find it significant that the court in *Miami University* observed that the *result* of the Ohio Supreme Court's opinion, i.e. the mandamus requiring the school to release the redacted disciplinary records, appeared to comport with the requirements of FERPA. *See id.* at 811.

If student disciplinary records are education records under FERPA, and the result of the *Miami Student* decision, i.e. the release of redacted student disciplinary records, comports with FERPA's requirements, then one may logically conclude that the redacted student disciplinary records in the *Miami Student* case were not "education records" for purposes of FERPA, but that the un-redacted student disciplinary records in the *Miami University* case were. In other words, with all identifying information redacted from the student disciplinary records, they no longer "contain[ed] information directly related to a student" or "personally identifiable infor-

mation" of a student. 20 U.S.C. §§ 1232g(a)(4)(A)(i), 1232g(b)(1).

With this in mind, we return to the question of whether the Reed materials are education records protected by FER-PA. We recognize that the records at issue in both *Miami Student* and *Miami University* were student disciplinary records, whereas the materials at issue in the present case relate to Knight, a University employee. Nevertheless, to the extent that the Reed materials contain information directly relating to students, their non-consensual disclosure would be a violation of FERPA.

However, we also must consider the effects that redaction might have upon the materials.[14] The Trustees claim that, because FERPA contains no provision for redaction of education records, redaction is prohibited. Indeed, the Trustees go so far as to suggest that if a 1000 page document consisting of otherwise discloseable material contained one line regarding a student's grade, then the entire 1000 page document must be withheld pursuant to FERPA. We reject such an interpretation.

 Although FERPA contains no redaction provision, neither does it prohibit such. Moreover, the Sixth Circuit gave tacit approval to the redaction of student records in the *Miami University* case. 294 F.3d at 811. APRA permits redaction in that it specifically mandates separation of discloseable from non-discloseable information contained in public records containing both. I.C. § 5–14–3–6(a). Therefore, if a public record contains some information which qualifies under an exception to public disclosure, instead of denying access to the record as a whole, public agencies must redact or otherwise separate those portions of the record which would otherwise render it non-discloseable.

In the case at bar, the trial court concluded that the Reed materials were non-discloseable due to the fact that the materials referenced current or former students of Indiana University. However, from the trial court's order it is unclear whether the trial court considered the possibility of redaction. In fact, given the Trustees' arguments that redaction was not permitted by FERPA, it appears the trial court did not consider redaction. Although we do not have the Reed materials before us, the record does contain the Trustees' "document log" which lists each document gathered during the Reed investigation, along with a brief description of its contents and the reasons the Trustees felt the document to be non-discloseable. This log indicates that some of the Reed materials likely contain little or no information directly relating to students.

For example, the log lists "Notes of telephone interview with Indiana University Athletic Department staff member regarding alleged altercation by Knight against that staff member." Appellant's App. at 17. Certainly the brunt of this interview relates to an altercation between Knight and the University employee, and if any information that could lead to the identification of a current or former student were to be redacted, these interview notes would, as a matter of law, not be education records and not protected by FERPA. The document log also lists "Notes of telephone call with video expert regarding expert's opinions about Reed's

14. The Trustees note that the Star argued for redaction at the trial court level, but do not specifically argue for such upon appeal. Be that as it may, APRA specifically mandates separation of discloseable information whenever a request is made pursuant to APRA. I.C. § 5–14–3–6(a). The Trustees cannot avoid this mandate simply because the Star's current appellate argument is that the Reed materials are, in their entirety, not education records pursuant to FERPA.

allegations based upon expert's study and review of videotape of Indiana University basketball practice." *Id.* at 18. Again, if identifiable student information were to be redacted from these notes, we are unable to see how they would be education records protected by FERPA. Yet another entry in the document log is "Notes of telephone interview with staff member of IU Athletic Department regarding whether Knight choked Reed, displayed soiled toilet paper to players, ejected Brand from practice, and engaged in other misconduct." *Id.* We might reasonably presume that portions of these notes would include identifiable student information. However, the portion regarding the alleged incident with Knight and President Brand would not necessarily include any student information, and, if these notes were properly redacted to eliminate any identifiable student information, they would not be protected by FERPA.

Therefore, we instruct the trial court upon remand to review the Reed materials and redact or otherwise separate any portion of these documents which might contain information that could identify any present or former students in violation of the confidentiality mandated by FERPA.[15] In such a way, the Star would have access, albeit limited by redaction, to the materials it seeks pursuant to APRA, and the Trustees would protect the privacy of student information in accordance with FERPA. The Trustees claim that such redaction is impossible, in that the interviews by their very nature will give away the identity of the students involved. However, as dis-

cussed above, there are several examples in the document log which belie this argument. We nonetheless emphasize that *any* information which could lead to the identity of former or present students of Indiana University must be redacted. Whether or not this limits the intelligibility of the documents, this is what is required by APRA and FERPA.

Of course, the Trustees also claim that the Reed materials are protected by the "deliberative materials" exception to APRA. We do not address here whether the Reed materials are protected from disclosure under that provision, but instead simply hold that these materials, properly redacted, would not be protected education records under FERPA.

## IV

### *Deliberative Materials Exception*

■■■ The trial court determined that the Reed materials were protected from public disclosure under the "deliberative materials" section of APRA, which states that "[r]ecords that are intra-agency or interagency advisory or deliberative material ... that are expressions of opinion or are of a speculative nature, and that are communicated for the purpose of decision making" are excepted from public disclosure at the discretion of the public agency. I.C. § 5–14–3–4(b)(6). The purpose of protecting such communications is to "prevent injury to the quality of agency decisions." *Newman v. Bernstein*, 766 N.E.2d 8, 12 (Ind.Ct.App.2002) (quoting *N.L.R.B.*

---

15. The Department of Education has defined personally identifiable information as follows:

"Personally identifiable information includes, but is not limited to:
(a) The student's name;
(b) The name of the student's parent or other family member;
(c) The address of the student or student's family;

(d) A personal identifier, such as the student's social security number or student number;
(e) A list of personal characteristics that would make the student's identity easily traceable; or
(f) Other information that would make the student's identity easily traceable."
34 C.F.R. § 99.3.

*v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)).[16] The frank discussion of legal or policy matters in writing might be inhibited if the discussion were made public, and the decisions and policies formulated might be poorer as a result. *Newman*, 766 N.E.2d at 12 (quoting *Sears*, 421 U.S. at 150, 95 S.Ct. 1504).

■ The Star claims that the trial court's decision was wrong in that the trial court did not distinguish between pre-decisional materials and post-decisional materials and that the trial court did not differentiate factual information from deliberative content contained in the Reed materials.[17]

### A. Pre–Decisional and Post–Decisional Materials

■ The Star claims that the trial court failed to distinguish between those materials which were created before the decision to discipline Knight was made and those materials which were created afterward in an effort to support the decision already made. We note that section 4(b)(6) does not explicitly recognize a distinction between pre-decision and post-decision materials. Instead, this distinction has been drawn in cases involving the federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

In *Sears*, the United States Supreme Court explained:

> "The quality of a particular agency decision will clearly be affected by the communications received by the decision-maker on the subject of the decision prior to the time the decision is made. However, *it is difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached;* and therefore equally difficult to see how the quality of the decision will be affected by forced disclosure of such communications, as long as prior communications and the ingredients of the decisionmaking process are not disclosed. Accordingly, the lower courts have uniformly drawn a distinction between predecisional communications, which are privileged, and communications made after the decision and designed to explain it, which are not." 421 U.S. at 151–52, 95 S.Ct. 1504 (emphasis supplied) (citations omitted).

The Star claims that in *Newman*, this court adopted the pre- and post-decisional distinction drawn in *Sears*. In *Newman*, the trial court had relied upon *Sears* in concluding that APRA required the Marion County Prosecutor's Office to disclose its plea bargain policy manual to a criminal defendant. 766 N.E.2d at 12. Upon appeal, the *Newman* court reversed the deci-

**16.** The *Sears* court was interpreting an analogous provision of the federal Freedom of Information Act.

**17.** In support of these arguments, the Star cites cases interpreting the federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The Trustees respond that the Star has waived any FOIA-related argument for failure to mention FOIA at the trial court level. However, the Star did argue before the trial court that the factual information contained in the Reed materials was discloseable. Thus, the substance of its FOIA-based argument was

before the trial court. In addition, the Star argued that the trial court could look to cases interpreting FOIA when faced with an issue under APRA. On appeal, the Star is not precluded from citing additional authority to support an argument which was presented to the trial court. Otherwise, parties would be unable to further develop their arguments upon appeal and would be required to rely only upon those cases cited at the trial court level. Therefore, because the arguments have not been waived, we address the Star's arguments which are supported with citation to cases interpreting FOIA.

sion of the trial court, holding *"Even if we assume those categories—pre- and post-decision communication—should apply to this case, we do not think the plea policy manual should be disclosed." Id.* (emphasis supplied). Thus, the *Newman* court did not expressly adopt the pre- and post-decisional distinction relevant to FOIA. We also decline to expressly adopt the pre- and post-decisional distinction.

▇ Nevertheless, even if we were to apply the pre- and post-decisional distinction, the Star would not prevail. The Star admits that Eichhorn and Walda met with Brand on May 3, 2000 and orally presented their findings based upon the Reed materials. It also admits that on May 14, 2000, Brand met with various Trustees, including Eichhorn and Walda, to discuss the investigation, and that this meeting constituted Eichhorn and Walda's "final report" to Brand concerning the Reed materials. Appellant's Br. at 9–10. It is undisputed that Brand made his decision to discipline Knight on May 15, 2000.[18] Thus, even according to the facts as presented by the Star, the Reed materials were communicated to Brand *prior* to his decision to discipline Knight. Therefore, the Reed materials are pre-decisional in nature, and we cannot fault the trial court for failing to draw a distinction between pre- and post-decisional materials.[19]

### B. Deliberative and Factual Material

▇ The Star claims that the trial court erred in concluding that the Reed materials, in their entirety, constitute deliberative materials, and failing to differentiate between the factual and deliberative portions.[20] Citing *Envtl. Prot. Agency v. Mink,* 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), a case interpreting FOIA, the Star claims that any severable factual material contained in the Reed materials must be made available for public access. In *Mink,* several members of the United States Congress filed suit under FOIA to obtain access to documents held by Executive Branch officials concerning underground nuclear weapons testing. The Executive Branch argued that several of the documents were protected from disclosure by the exemption contained in subsection (b)(5) of FOIA,[21] which states that the public access requirements do not apply to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." The Court held that the legislative history of the exemption demonstrated that Congress intended to incorporate the rule that confidential intra-agency advisory opinions are privileged from inspection. *Id.* at 86, 93 S.Ct. 827. The Court recognized that this exemption also has recognized limits;

---

18. The Star faults the trial court for not determining "what portion of the [Reed materials] constituted President Brand's final decision...." Appellant's Br. at 29. But none of the Reed materials were prepared by Brand and cannot constitute his decision, which the Star admits occurred on May 15, 2000. In addition, Eichhorn testified during deposition that he made no recommendations concerning any potential discipline of Knight.

19. We do note, however, that the text of APRA's "deliberative materials" exception would appear to support the drawing of such a pre- and post-decisional distinction. Materials made after a decision has been made

and designed to explain it are not "communicated for the purpose of decision making," as the decision has necessarily already been made. If materials are not communicated for purposes of decision making, they are not protected by the deliberative materials exception.

20. The Star does not claim that the Reed materials were not communicated for decision-making purposes, but instead focuses its argument on the claim that the factual portions of the Reed materials must be disclosed.

21. 5 U.S.C. § 552(b)(5).

specifically, that the exemption contemplated "the discovery of purely factual material appearing in documents in a form that is severable without compromising the private remainder of the documents." *Id.* at 91, 93 S.Ct. 827.

In response to the argument that the documents at issue in *Mink* "contain[ed], by their very nature, a blending of factual presentations and policy recommendations that are necessarily 'inextricably intertwined with policy making processes,'" the Court stated that the Court of Appeals' remand order answered any such concerns. *Id.* at 92, 93 S.Ct. 827. The Court of Appeals for the District of Columbia had instructed the District Court to "disclose only such factual material that is not 'intertwined with policy-making processes' and that may safely be disclosed 'without impinging on the policymaking decisional processes intended to be protected by this exemption.'" *Id.* Here, the Star claims that the reasoning of the *Mink* court in interpreting FOIA should apply to the present case involving APRA, and that the trial court should have ruled that all purely factual matters contained in the Reed materials should be disclosed.

▆▆ The Trustees respond that the case of *Journal Gazette v. Bd. of Trustees of Purdue Univ.*, 698 N.E.2d 826 (Ind.Ct. App.1998), controls the outcome of the present case.[22] In that case, the Journal Gazette requested various documents from Purdue University relating to complaints regarding the athletic department. Purdue disclosed some but not all of the documents sought, and the Journal Gazette brought suit pursuant to APRA. Following an evidentiary hearing, the trial court ruled in favor of Purdue.

Upon appeal, a panel of this court affirmed the trial court, in part holding that several of the documents sought by the Journal Gazette were protected by the deliberative materials exception contained in section 4(b)(6) of APRA. Among these documents were grievances alleging improper or unfair treatment. The court held:

"[T]he complaints submitted to Purdue are retained as documents which are part of its decision making process and are speculative in nature. Purdue's primary use of the documents at this time would be to determine which, if any, action should be taken in response to the grievances. There is testimony in the record that a grievance document is submitted to the decision maker at each step of the grievance process so that Purdue can make a decision about the treatment of an employee. Therefore, the trial court did not err in determining that they are retained for the purpose of decision making, as any investigative documents generated in response to the grievances, and excluding them from the disclosure requirement. Additionally, miscellaneous documents ... that are all a part of the follow up of the Joseph and Dunn grievances, are also excluded from

---

22. The Trustees claim that, because the Star failed to mention the *Journal Gazette* case in its Appellant's Brief, it is barred from discussing such in its reply brief. However, the case cited by the Trustees in support for this position states that an *issue* that was not advanced in a party's original brief would not be considered if raised in the reply brief. *LeBrun v. Conner*, 702 N.E.2d 754, 758 (Ind.Ct. App.1998). The issue to which the *Journal Gazette* case is relevant was advanced in the Star's original brief, and the fact that the Star did not discuss this case therein does not preclude it from responding to the Trustees' arguments in its reply brief. Indiana Appellate Rule 46(C) states that although "[n]o new issues shall be raised in the reply brief," the reply brief is to be in "respon[se] to the appellee's argument." Though the Star's failure to cite an Indiana case which may be unfavorable to its position is troubling, it does not preclude the Star from responding to the Trustees' argument involving the *Journal Gazette* case.

the disclosure requirement as Purdue has shown that they are a part of the decision making process which follows employee grievances." *Id.* at 830.

The court also held that several other documents requested by the Journal Gazette were protected deliberative materials—specifically, documents regarding two specific allegations made against Purdue athletes, a letter received by Purdue containing allegations of NCAA violations, and documents received by Purdue regarding NCAA violations reported to Purdue but not to the NCAA. The court held that testimony had sufficiently "establish[ed] the nature of the documents and that they were used for a decision making purpose. Additionally, there [was] ample testimony that the contents of the documents consist[ed] of opinions and speculation of an NCAA violation." *Id.* at 831.

Lastly, the *Journal Gazette* court held that invoice vouchers gathered by Purdue's athletic department as part of its investigation into the alleged NCAA violation, were protected from disclosure because they were "collected and retained by the athletic department as part of its investigation of alleged NCAA violations and are therefore covered by the (b)(6) exception." *Id.* at 831–32.

The Trustees claim that the situation before us is the same as that before the court in *Journal Gazette*, i.e., that the Reed materials concern whether Knight treated basketball players "unfairly" or "improperly," and are speculative or matters of opinion by their very nature. To the extent that the Reed materials contain such speculation or opinion, we agree. We note, however, that the trial court's findings and conclusions state that, "The Reed Investigatory Documents are 'deliberative material' which contain expressions of opinion, *have some speculative material and/or opinions,* and were to be 'communicated for the purpose of decision making'

to President Brand concerning Coach Knight." Appellant's App. at 14 (emphasis supplied). We recognize that the trial court's findings and conclusions are not binding upon appeal. Nevertheless, by stating that the Reed materials contained "some" speculative material and/or expressions of opinion, a negative inference can be drawn that "some" of the Reed materials do not contain such. This inference is supported by a review of the Trustees' document log, which also indicates that portions of the Reed materials concern factual matters. For example, several of the documents in the log relate to the interviewees' knowledge of whether Knight removed Brand from a session of basketball practice. This incident either did or did not happen; whether this incident occurred is a factual matter, not opinion or speculation. On the other hand, a witness's opinion as to whether Knight engaged in "misconduct" would seem to be speculative in nature or contain expressions of opinion.

The question remains as to what to do with this combination of factual matters and deliberative materials. The Trustees would have us declare an entire document non-discloseable based upon the fact that it contains some speculative material or expressions of opinion. The *Journal Gazette* opinion could be read to support such a position, in that the court held that it was "not necessary for Purdue to specifically prove the exception for each individual document. The documents were requested as a whole or a group: those dealing with NCAA violations, and no document in this group did not fall under this category." 698 N.E.2d at 831.

 However, section 6 of APRA requires a public agency to separate discloseable from non-discloseable *information* contained in public records. I.C. § 5–14–3–6(a). By stating that agencies are

required to separate "information" contained in public records, the legislature has signaled an intention to allow public access to whatever portions of a public record are not protected from disclosure by an applicable exception. To permit an agency to establish that a given document, or even a portion thereof, is non-discloseable simply by proving that some of the documents in a group of similarly requested items are non-discloseable would frustrate this purpose and be contrary to section 6. To the extent that the *Journal Gazette* case suggests otherwise, we respectfully decline to follow it.[23]

Instead, we agree with the reasoning of the United States Supreme Court in *Mink, supra,* i.e., that those factual matters which are not inextricably linked with other non-discloseable materials, should not be protected from public disclosure. *See* 410 U.S. at 92, 93 S.Ct. 827. Consistent with the mandate of APRA section 6, any factual information which can be thus separated from the non-discloseable matters must be made available for public access.

We therefore instruct the trial court to review the Reed materials in camera and determine what portions of the Reed materials contain factual materials not inextricably linked to non-discloseable materials and allow the Star access to such factual materials. Of course, this separation or redaction must be done in addition to that which would remove any protected student information pursuant to our conclusion in Part III.

In response to an argument presented by amicus curiae,[24] the Trustees claim that confidentiality was promised to many of the witnesses interviewed, and any breach of this confidentiality by disclosing the Reed materials might chill future internal investigations for fear of exposure or reprisals. We recognize this as a legitimate concern. However, the Trustees do not refer us to any provision or precedent, nor does our review of section 4 reveal, that public records are non-discloseable simply because a public agency promised or indicated to a witness that the information gathered would remain confidential.

Be that as it may, we have already concluded that any identifiable student information must be redacted from the Reed materials before the Star may have access to them. As many of the interviewees were students, this would lessen the Trustees' concerns of violating promises of confidentiality. In addition, because the IUPD materials are non-discloseable, the information gathered during the IUPD investigation will remain confidential. Also, the Trustees argued to the trial court that the Reed materials were non-discloseable attorney work product. *See* I.C. § 5–14–3–4(b)(2). Our conclusion that some portions of the Reed materials are discloseable will require the trial court to determine the one genuine issue of material fact it

---

23. We note that no mention was made in *Journal Gazette* of APRA section 6.

24. Amicus curiae argues that, in determining whether a record is protected by section 4(b)(6), our focus should be on the effect of the disclosure, i.e., will it adversely affect the deliberative process. Section 4(b)(6) defines as non-discloseable those records which are intra- or inter-agency advisory or deliberative material that are expressions of opinion or

are of a speculative nature and are communicated for the purpose of decision making. If a record falls within this definition, an agency has the discretion not to disclose it. Although we might generally assume that the release of records within this definition could adversely affect the deliberative process, the statute does not allow us to look solely to the effect of release without considering whether a record meets the statutory requirements of the exception.

found—whether Eichhorn and Walda were acting as attorneys for Indiana University when they conducted the Reed investigation. If they were, those materials which we hold today are not protected by the exceptions at issue before us might nevertheless be non-discloseable attorney work product.

## V

*Personnel File Exception*

■ Section 4(b)(8) of APRA reads in pertinent part:

"(b) Except as otherwise provided by subsection (a), the following public records shall be excepted from section 3 of this chapter at the discretion of a public agency:

\* \* \*

(8) Personnel files of public employees and files of applicants for public employment, except for:

\* \* \*

(C) information concerning disciplinary actions in which final action has been taken and that resulted in the employee being disciplined or discharged."

The Trustees do not claim that the Reed or IUPD materials fall within this personnel file exception. However, the Star claims that section 4(b)(8)(C) mandates that the Trustees disclose the Reed and IUPD materials, even if they otherwise fall within one or more other exceptions to disclosure. The Trustees claim in response that section 4(b)(8)(C) is simply an "exception to the exception" listed in section 4(b)(8), and that if another disclosure exception is applicable, then the materials sought may still be protected from disclosure. We agree with the Trustees.

We note that sections 4(b)(8)(A) through (C) [25] are listed under the exception contained in section 4(b)(8). If 4(b)(8)(A) through (C) trumped all exceptions to disclosure, one would not expect them to be listed under the section 4(b)(8) exception. More importantly, to read section 4(b)(8)(C) to trump all other exceptions would render other portions of section 4 superfluous. Specifically, section 4(b)(12) states that an agency may, at its discretion, not disclose "[r]ecords specifically prepared for discussion or developed during discussion in an executive session under IC 5–14–1.5–6.1. *However, this subdivision does not apply to that information required to be available for inspection and copying under subdivision (8)."* I.C. § 5–14–3–4(b)(12) (emphasis supplied).

■ The reference to information *required* to be disclosed by subdivision (8), i.e., section 4(b)(8), might appear at first glance to support the Star's reading of section 4(b)(8)(C) as a trump which does "require" such information to be disclosed. However, if this subsection were a trump over all other applicable exceptions, there would be no need for the General Assembly to explicitly state that records excepted by section 4(b)(12) are nonetheless subject to the exceptions listed in section 4(b)(8)(A) through (C). We will not interpret a portion of a statute to be meaningless if it can be reconciled with the rest of the statute. *MDM Investments v. City of Carmel,* 740 N.E.2d 929, 934 (Ind.Ct.App. 2000). Thus, we hold that sections 4(b)(8)(A), (B), and (C) are exceptions only to the disclosure exceptions listed in sections 4(b)(8) and (12). However, the section 4(b)(8)(A), (B), and (C) exceptions do not trump the remaining disclosure exceptions listed in section 4.

---

**25.** Section 4(b)(8)(A) concerns biographical data of present or former officers or employees. Section 4(b)(8)(B) relates to information relating to the status of any formal charges against the employee. It is not claimed that 4(b)(8)(A) or 4(b)(8)(B) are here applicable.

Our holding is further supported by APRA section 9, which states that, when the issue before the trial court is whether a public agency properly denied access to a public record based upon a section 4(b) exception, the public agency meets its burden of proof by "proving that the record falls with *any one* of the categories of exempted records under section 4(b) of this chapter." I.C. § 5–14–3–9(f) (emphasis supplied).

◼ Furthermore, even if we were to agree with the Star that section 4(b)(8)(C) acted as a trump, we do not agree that the materials sought by the Star would be required to be disclosed. Section 4(b)(8)(C) covers information concerning disciplinary actions, but only those in which "final action" has been taken and in which that "final action" was discipline or discharge. Thus, this subsection requires that information concerning the final disciplinary action, i.e. discipline or discharge, be disclosed. Here, Knight was both disciplined and discharged, and these actions were "final actions." The question is whether the Reed materials are "information concerning" these final actions as claimed by the Star. We answer in the negative.

The Reed materials are not information concerning the final disciplinary action; they are instead the underlying investigatory documents which led to the final disciplinary action. Indeed, the final disciplinary decision was yet to be made when the Reed materials were created. Information concerning the final disciplinary action might encompass the nature, extent, and general reason behind the decision to discipline or discharge a public employee, but not the intimate details of the factual investigation which forms the basis of the action. The same is true regarding the IUPD materials, which the Star claims must be disclosed pursuant to section 4(b)(8)(C). These materials are not infor-

mation concerning the final action taken, i.e., the discipline and discharge of Knight, but are instead investigatory documents concerning the incident which eventually led to the discharge of Knight.

As noted by the Trustees, the Star's position would lead to the incongruous result of protecting investigatory information where no discipline or discharge occurred, but disclosing such if the employee was disciplined or discharged. This could operate to discourage public agencies from taking such final actions for fear that their investigations would be compromised. We do not believe this was the intent of the General Assembly. Therefore, the trial court did not err in determining that the Reed and IUPD materials were not discloseable pursuant to APRA section 4(b)(8)(C).

VI

*Incorporation and Waiver*

Lastly, we address two related, but subtly different issues presented by the Star. The first is that, because the Trustees' final decision expressly incorporated or adopted by reference the reasoning contained in the Reed materials, the Reed materials are not protected by the deliberative materials exception contained in APRA section 4(b)(6). The second is that the Trustees waived all of the applicable APRA exceptions by selective disclosure of the Reed materials.

*A. Incorporation*

◼ Citing two cases interpreting FOIA, the Star claims that the Trustees cannot avail themselves of the deliberative materials exception contained in section 4(b)(6) of APRA because the Trustees' final decision expressly adopted or incorporated the reasoning contained in the Reed materials.

In *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29

(1975), Sears sought, pursuant to FOIA, to compel the disclosure of advice and appeals memoranda issued by the general counsel of the National Labor Relations Board. The N.L.R.B. claimed that the memoranda at issue were protected by exemption 5 of FOIA, 5 U.S.C. § 552(b)(5), which protects from disclosure inter-agency and intra-agency memoranda. *See Mink,* 410 U.S. at 86–87, 93 S.Ct. 827. The N.L.R.B. claimed that the District Court had erred in holding that documents incorporated by reference in non-exempt memoranda lose the protection otherwise afforded them as intra-agency memoranda. *Sears,* 421 U.S. at 161, 95 S.Ct. 1504. The *Sears* Court rejected the N.L.R.B. argument and held that, if an agency chooses expressly to adopt or incorporate by reference an intra-agency memorandum previously covered by the exemption contained in subsection (b)(5) of FOIA in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of another exemption. *Id.*

In *Niemeier v. Watergate Special Prosecution Force,* 565 F.2d 967 (7th Cir.1977), the plaintiff requested from the Special Prosecutor a copy of a memorandum sent to the Special Prosecutor from the Counsel to the Special Prosecutor. This request was denied, and the plaintiff brought suit under FOIA to gain access thereto. The memorandum in question had been quoted and relied upon in a letter written by the Special Prosecutor to the Attorney General explaining the decision not to seek a criminal indictment of former President Richard Nixon. The District Court concluded that the memorandum fell within the ambit of exemption five of FOIA.

Upon appeal, the Seventh Circuit Court of Appeals held that:

"where an underlying memorandum is expressly relied on in a final agency dispositional document, even though only part of it is expressly reproduced, .... a presumption in favor of disclosability of the memorandum as a whole is created. This presumption is subject to rebuttal by the agency challenging disclosure upon the showing that other portions of the memorandum fall within the coverage of some exemption other than exemption five." *Id.* at 973.

The Court thus concluded that the memorandum had lost any exempt status due to the fact that it had been expressly relied upon and quoted. *Id.*

The Star claims that the reasoning contained in the Reed materials was expressly adopted and/or incorporated into documents which were publicly available and represented final decisions. The Star does not explain why the holdings of these FOIA cases should apply to APRA, and after examination of the appropriate section of APRA, we decline to apply this doctrine in the present case. Be that as it may, even if we were inclined to adopt this incorporation/adoption doctrine from these federal cases, the Star would still not prevail because none of the publicly released materials referred to by the Star expressly incorporate or adopt the Reed materials.

As discussed in full below, the Summary Report and Knight Sanctions documents are generalized descriptions of the investigation and the conclusions drawn therefrom. The statement announcing the sanctions to the press merely says that the investigation "found a pattern of inappropriate behavior." Appellant's App. at 206. The Statement of Principles on the Conduct of Participants in Student Athletic Programs, though perhaps drafted in response to the circumstances surrounding the Knight investigations, makes no direct mention thereof.

This is in contrast to the situation in *Niemeier,* wherein the final decision involved:

"more than the mere quotation of a legal memorandum ... but also the statement that the Special Prosecutor's decision was consistent with the conclusions reached by Mr. Lacovara and thereby gained support therefrom. Moreover, the [Special Prosecutor's] Report contains the statement that the memorandum was on file in the office of the Special Prosecutor. These circumstances imply that scrutiny of the memorandum as a whole is invited in order to assess the strength of the reasoning that was behind the quoted legal conclusions." 565 F.2d at 973.

We reject the Star's notion that any publicly released document which arose out of the investigation pierces any applicable disclosure exception. The trial court did not err by failing to consider whether the Reed materials were expressly incorporated or adopted by the Trustees' final decision.

### B. Waiver

The Star contends that the trial court erred when it failed to recognize and apply the doctrine of waiver in the present case. The Star acknowledges that APRA contains no waiver provision but maintains that the common law doctrine of waiver can and should apply to the present case. The Star cites federal cases interpreting FOIA, which has no waiver provision, wherein the doctrine of waiver was applied. *See Cooper v. Dep't of Navy,* 594 F.2d 484 (5th Cir.1979) (Navy could not deny plaintiffs access to portions of accident report in civil action against helicopter manufacturer where Navy had allowed manufacturer access to same), *cert. denied* 444 U.S. 926, 100 S.Ct. 266, 62 L.Ed.2d 183; *N. Dakota ex rel. Olson v. Andrus,*

581 F.2d 177 (8th Cir.1978) (government waived FOIA exemption asserted against North Dakota where it had previously voluntarily surrendered the documents in question to National Audubon Society); *Mead Data Central, Inc., v. U.S. Dep't of Air Force,* 566 F.2d 242 (D.C.Cir.1977) (Air Force could not claim FOIA exemption where the allegedly confidential information had already been fully disclosed to at least one party outside the Department).

The Star also cites to cases from other states, especially Ohio, wherein courts have applied waiver despite the fact that the relevant state public-access statutes had no waiver provision. *See State ex rel. WLWT–TV5 v. Leis,* 77 Ohio St.3d 357, 673 N.E.2d 1365 (1997) (absent evidence that respondents had already disclosed the investigatory records to the public and thereby waived application of certain exemptions to public disclosure law, the exemptions were applicable); *State ex rel. Zuern v. Leis,* 56 Ohio St.3d 20, 564 N.E.2d 81 (1990) (sheriff's department waived any claim of exemption to public access of homicide investigation records by the prior voluntary disclosure of the material to third parties in an earlier lawsuit).

The Star claims that the Trustees selectively and extensively disclosed portions of the Reed materials to bolster their decision to discipline and eventually fire Knight, and that any APRA exception claimed by the Trustees has therefore been waived. The Trustees respond that APRA contains no waiver provision, and that therefore waiver may not be applied to defeat any of the relevant exceptions to disclosure. The Trustees also claim that, even if waiver may be applied to APRA exceptions, they did not waive any exception in the present case.[26] We disagree

---

**26.** The Trustees also claim that the Oregon cases cited by the Star are readily distinguishable from the present case in that the relevant

Oregon public-access statute contains a specific waiver provision. *See e.g. Oregonian*

with the Trustees' suggestion that, simply because APRA contains no waiver provision, a public agency cannot waive the exceptions to public disclosure.

 Waiver is the voluntary and intentional relinquishment of a known right. *City of Evansville v. Follis*, 161 Ind.App. 396, 402, 315 N.E.2d 724, 727 (1974). *See also* 28 AM.JUR.2D *Estoppel and Waiver* § 197 (2000) (defining waiver as the voluntary and intentional relinquishment of a known right, claim, or privilege). We can envision a situation in which a state agency might relinquish the protections afforded by APRA's exceptions. If, for example, an agency allowed one party access to materials and then in turn denied another party access to the same materials based upon an exception to APRA, the agency might well be held to have waived the applicable APRA protections. *Cf. Cooper*, 594 F.2d at 487–88; *Zuern*, 564 N.E.2d at 84. Nor do we believe that such a conclusion would frustrate the underlying purpose of the APRA exceptions, for if the agency has already disclosed the allegedly non-discloseable materials, the purpose of the APRA exceptions will have already been compromised. Moreover, in such a case, the decision to deny access after allowing others access could be considered an arbitrary and capricious abuse of discretion. *See* I.C. § 5–14–3–9(f)(2). Be that as it may, here the Trustees did not waive any APRA exceptions. We do not agree with the Star that the Summary Report and the Knight Sanctions documents released to the public "quoted integral and extensive portions of the Knight Disciplinary Records...." Appellant's Br. at 45.

The Summary Report is slightly over three pages of typewritten double-spaced text. It contains a brief explanation of the task assigned to Eichhorn and Walda by Brand. Following this is a brief explanation of the investigatory processes undertaken by Eichhorn and Walda, including the hiring of private investigators and the process of contacting potential witnesses. The Summary Report explains that twenty-eight individuals were interviewed, including eleven Indiana University Athletic Department employees, nine student managers or trainers, and seven former members of the basketball team.

The Summary Report next describes the conclusions of an expert hired to review a videotape of the incident where Knight allegedly choked Reed, and the conclusion of the expert. The next three paragraphs briefly describe the interviewees' recollection concerning three events: the Neil Reed incident, the so-called "toilet paper incident," and whether or not Knight removed Brand from basketball practice. These paragraphs conclude with the Trustees' opinions regarding these incidents, which are as follows: (1) that the Reed incident was "unusual, brief, and constituted inappropriate contact between a coach and player," (2) that the "toilet-paper incident" story had "very little credibility," and (3) that there was very little support for the allegation that Knight removed Brand from basketball practice. Appellant's App. at 187. The Summary Report is a very generalized overview with very little specific information concerning the underlying investigatory materials and without the quotation of extensive and integral portions of the Reed materials as claimed by the Star.

The Star also claims that the Trustees waived any APRA exceptions through the release of information contained in the Knight Sanctions document. However, this document, like the Summary Report, is a non-specific and generalized overview

---

*Publ'g Co. v. Portland Sch. Dist.,* 152 Or.App. 135, 952 P.2d 66, 68 (1998), *aff'd* 329 Or. 393, 987 P.2d 480 (1999). The Star acknowledges this in its reply brief.

of the findings of the Reed investigation, the conclusions of Eichhorn and Walda, and Brand's decision to discipline Knight. Neither of these documents contains the sort of release of otherwise non-discloseable information sufficient to warrant waiver of any of the APRA exceptions.

■ The Star further claims that Brand's responses to questions at a press conference operated to waive the relevant APRA exceptions. The Star supports this with a citation to Brand's deposition, in which he agreed that he had relied upon information relayed to him by Eichhorn and Walda in answering questions at the press conference. However, Brand explained that he discussed this only at a "certain level of generality." Appellant's App. at 42. The Star does not refer us to any evidence which contradicts this, nor does our review of the record reveal any such evidence. The information publicly released by the Trustees is insufficient to constitute waiver of the APRA exceptions asserted, nor have the Trustees allowed other parties to access the Reed materials, only to deny the Star access.

The Star almost suggests an "all or nothing" approach wherein any public comment based upon non-discloseable materials would waive the applicable disclosure exceptions. This approach might well result in less public knowledge, as agencies would be loath to release any information or make any public comment for fear of waiving the exceptions they might otherwise claim. This would frustrate the underlying purpose of APRA. If a public agency makes a decision based upon non-discloseable materials, and provides general information to the public regarding this decision, we see no reason to punish the agency which has volunteered the information by requiring it to disclose otherwise non-discloseable materials. The doctrine of waiver is not applicable here, and the trial court did not err by failing to con-

clude that the Trustees have waived the exceptions to APRA asserted.

Regarding the IUPD materials, the Star claims that the Trustees likewise waived any relevant APRA exception to public disclosure of these materials, but the Star does not refer to precisely what information was released to the public which might constitute such waiver. Both the Summary Report and the Knight Sanctions documents were prepared prior to the IUPD investigation. The only other public disclosure referred to by the Star is the press conference wherein the decision to discharge Knight was announced. The Star's citations to the record do not reveal the content of this press conference, but simply demonstrate that the contents of the IUPD materials were made known to Brand in a meeting at his residence on the Bloomington campus. We fail to see how this amounts to selective disclosure sufficient to constitute waiver.

Our own review of the record reveals that the Trustees did issue a press release announcing that IUPD investigated an incident between Knight and a University student and submitted this report to the Monroe County Prosecutor's Office. This release also states that eight people were interviewed in conjunction with this investigation, that there was an "exchange between Coach Knight and a student," and that "there was no dispute" that Knight had physical contact with the student, but that the severity of the contact was disputed. Appellant's App. at 208. The release also indicated the University's intention not to pursue any "further action," in accord with the student's wishes. *Id.*

■ The record also contains a press release dated September 10, 2000, titled "Remarks of President Myles Brand" in which the decision to terminate Knight's employment was announced. This document also references the IUPD files in a

manner akin to the above-referenced press release:

> "The coach reached out and initiated physical contact with the student on his arm, and the two had, according to varying accounts, an uncomfortable exchange. It is not in dispute that the coach reached out and grasped the young man's arm in an unwelcome fashion. The severity of that act is in dispute, however. But the bottom line is that an angry confrontation with a student explicitly violates the spirit and letter of the guidelines set down on May 15." *Id.* at 210.

These press releases represent general summations of the IUPD investigation, not a selective disclosure to another party or the public sufficient to constitute waiver of APRA's disclosure exceptions vis-à-vis the IUPD materials. Therefore, the trial court did not err in concluding that the Trustees did not waive any relevant APRA disclosure exception.

### Conclusion

The Reed materials do not, in their entirety, constitute education records required to be kept confidential by FERPA, and upon remand, the trial court should review and redact or otherwise separate any information contained in the Reed materials which might violate FERPA. Any discloseable materials must be made available to the Star, subject to the applicable exceptions set forth below. The Reed materials are pre-decisional in nature, and the trial court did not err by not distinguishing which of the materials were pre-decisional and which were post-decisional. Any factual information contained in the Reed materials should also be made available to the Star, whereas those portions of the Reed materials which represent opinions or speculation should be redacted. The Reed materials do not constitute information concerning the final action of disciplining Knight. The Trustees' final decision did not incorporate or adopt the Reed materials in such a manner as to require disclosure thereof. The disclosure exceptions applicable to the Reed materials were not waived by selective disclosure to the public or third parties. Thus, those portions of the Reed materials which contain identifiable student information, expressions of opinion, or speculation are protected from disclosure and must be redacted or otherwise separated from the remaining discloseable information which must be made available to the Star.

The IUPD materials are non-discloseable investigatory records of a law enforcement agency. The IUPD materials do not constitute information concerning the final decision to discharge Knight, and the exceptions protecting the IUPD materials from public disclosure were not waived by the Trustees.

Our holding also requires the trial court to consider the one genuine issue of material fact it found, i.e., whether Eichhorn and Walda were acting as attorneys for Indiana University when they conducted the Reed investigation. This is relevant to the Trustees' claimed work-product exception. *See* I.C. § 5–14–3–4(b)(2).

The judgment of the trial court is affirmed in part, reversed in part, and the cause is remanded for proceedings not inconsistent with this opinion.

BAILEY, J., and MATHIAS, J., concur.